## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**THE NEW MEXICO ELKS ASSOCIATION,**
**FRATERNAL ORDER OF EAGLES, NEW MEXICO STATE AERIE,**
**NEW MEXICO LOYAL ORDER OF THE MOOSE,**

      **Plaintiffs,**

**v.**                                        **Case No. 1:21-cv-00354-KG-LF**

**MICHELLE LUJAN GRISHAM,**
**Individually, Acting Under the Color of Law,**
**and TRACIE C. COLLINS,**
**Individually, Acting Under the Color of Law,**

      **Defendants.**

## DEFENDANTS' RESPONSE TO PLAINTIFFS' REQUEST
## FOR TEMPORARY RESTRAINING ORDER

Defendants Governor Michelle Lujan Grisham and Secretary Tracie C. Collins (collectively, "Defendants"), by and through their counsel of record, hereby provide their response to Plaintiffs' requested preliminary injunctive relief contained in their Verified Complaint for Civil Rights Violations Under the Fourteenth Amendment to the United States Constitution and Request for Temporary Restraining Order [Doc. 1] (the "Complaint" or "Compl.") in accordance with this Court's April 19 Order [Doc 5]. As grounds for their response, Defendants state as follows.

### INTRODUCTION

In March, governors across the nation were forced to issue executive orders limiting business operations in an attempt to slow the spread of a deadly, novel virus. Though difficult, these restrictions were (and are) necessary to save millions of lives. Although there is hope on the horizon with the arrival of vaccines, the spread of COVID-19 persists. Governor Lujan Grisham—as the top elected executive official of New Mexico—in consultation with the State's top public

health experts, must balance public health considerations with economic harm and social wellbeing. Navigating these competing interests is difficult and fraught with uncertainty. It follows that many New Mexicans may disagree with policy decisions made in response to the pandemic. Those disagreements, however, do not give rise to a justiciable legal dispute, and Plaintiffs may not properly transmogrify policy choices into a federal cause of action.

## BACKGROUND

### I.    The rapid and dangerous spread of COVID-19 in New Mexico

Since its emergence only a few months ago, the novel coronavirus 2019, Sars-CoV-2, the virus that causes COVID-19, has spread exponentially across the globe, throughout the United States, and here in New Mexico. The confirmed number of infections in the United States provides a good illustration of this spread. There were just 12 confirmed cases in the United States on February 11, 2020; now, a little over one year later, there are more than 32.2 million confirmed cases and more than 572,000 deaths.[1] Globally, the number of confirmed cases has risen to over 148 million, with over 3.1 million related deaths.[2] In New Mexico, there are now over 197,000 confirmed cases and 4,029 related deaths.[3] While the vaccine rollout is promising, it remains to be

---

[1] *Previous U.S. COVID-19 Case Data*, Ctr. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/previouscases.html (last visited Aug. 9, 2020); *Cases in the U.S.*, Ctr. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 28, 2021).

[2] *WHO Coronavirus Disease (COVID-19) Dashboard*, World Health Organization, https://covid19.who.int/ (last visited Apr. 28, 2021).

[3] *2019 Novel Coronavirus Disease (COVID-19)*, N.M. Dep't of Health, https://cv.nmhealth.org/ (last visited Apr. 28, 2021).

seen what the recent discovery of more contagious, and possibly more deadly, variants will have on the course of the pandemic in New Mexico.[4]

COVID-19's rapid spread is attributable to certain characteristics of the virus that causes it and the ease with which that virus is transmitted. COVID-19 is a respiratory illness that causes severe complications in some patients, including pneumonia in both lungs, organ failure, and death. Like most respiratory illnesses, COVID-19 spreads easily through close person-to-person contact, and the risk of transmission increases if individuals interact with more people, come within six feet of one another, and spend longer periods of time together.[5] Although it has not yet been measured precisely, a significant portion of COVID-19 cases result in mild symptoms or no symptoms.[6] Additionally, even in cases that are symptomatic, the average time from exposure to symptom onset is five to six days, with symptoms sometimes not appearing until as long as thirteen days after infection.[7] This means that individuals who have been infected and have the potential

---

[4] *New Variants of the Virus that Causes COVID-19*, Ctr. for Disease Control and Prevention (Feb. 2, 2021), https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html; *Second case of B117 COVID-19 variant identified in New Mexico*, KRQE (Jan. 18, 2021), https://www.krqe.com/health/coronavirus-new-mexico/second-case-of-b117-covid-19-variant-identified-in-new-mexico/.

[5] *How COVID-19 Spreads*, Ctr. for Disease Control and Prevention (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html; *Deciding to Go Out*, Ctr. for Disease Control and Prevention (Sept. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/deciding-to-go-out.html#:~:text=COVID%2D19%20spreads%20easier%20between,People%20are%20wearing%20masks.

[6] Nathan W. Furukawa et al., *Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic*, Emerging Infections Diseases, Vol. 26, Num. 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article.

[7] *COVID-19 Basics: Symptoms, Spread and Other Essential Information About the New Coronavirus and COVID-19*, Harvard Medical School (March 2020), https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics.

to infect others usually do not know they are infected for at least several days (and may never know, if they remain asymptomatic).

The ease and rapidity with which COVID-19 spreads and its severe and sometimes fatal symptoms in a certain percentage of the population create a potential for mass deaths and a severely overloaded health care system. Because many individuals who have COVID-19 do not know they have been infected, the only effective way to combat the spread of COVID-19 and to mitigate its impacts is to limit person-to-person contact and large gatherings to the greatest extent possible. Although social distancing guidelines generally advise people to stay six or more feet apart, even that degree of distancing does not guarantee that an individual will not contract COVID-19. This means that every foray by a person into a public space with other people carries some risk of transmission, particularly in indoor environments. For instance, a recent study has shown that the act of speaking can emit thousands of potentially infectious droplets which can linger in an enclosed space for between 8 and 14 minutes and greatly increase the risk of transmission within that space. *Id.*

## II.    New Mexico's public health emergency orders

Recognizing the seriousness of this virus and its ability to spread exponentially through close contacts and public spaces, the Governor declared a public health emergency under the Public Health Emergency Response Act, NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015), and invoked the All Hazards Emergency Management Act, NMSA 1978, §§ 12-10-1 to -10 (1959, as amended through 2007), by directing all cabinets, departments, and agencies to comply with the directives of the declaration and the further instructions of the Department of

Health.[8] Consistent with the powers provided during an emergency under the Public Health Emergency Response Act and the All Hazards Emergency Management Act, as well as the Public Health Act, NMSA 1978, §§ 24-1-1 to -40 (1973, as amended through 2019), the Secretary subsequently entered a series of public health orders ("PHOs") encouraging New Mexicans to stay in their homes to the greatest extent possible and to practice all possible precautions when they are required to enter public spaces.[9] In addition, the PHOs limit most public and private gatherings of any significant size and curtail the operations of many businesses. *Id.*

The restrictions imposed by the PHOs on businesses have undergone changes over the past year in response to case incidence, transmission rates, and what the scientific community has learned about COVID-19's transmission. The PHOs issued at the beginning of the pandemic generally required all but "essential" businesses and non-profits such as hospitals, banks, grocery stores, to cease in-person operations. *See id.* Beginning in May, most businesses and non-profits were allowed to reopen at various capacities.[10] These capacities vary depending on whether the nature of the business activity presents an increased risk of transmitting the virus. For instance, "close-contact businesses" such as barbershops and tattoo parlors, bars, and "food and drink establishments" have been subject to stricter capacity limits than most other businesses.[11]

---

[8] Governor Michelle Lujan Grisham, *Executive Order 2020-004* (March 11, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/03/Executive-Order-2020-004-r.pdf.

[9] *See generally Public Health Orders and Executive Orders*, N.M. Dep't of Health, https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (last visited Apr. 28, 2021) (collecting PHOs and executive orders relating to COVID-19).

[10] *See, e.g.*, N.M. Dep't of Health, *Public Health Order*, (May 15, 2021), https://cv.nmhealth.org/wp-content/uploads/2020/05/5-15-2020-PHO.pdf.

[11] *See, e.g.*, N.M. Dep't of Health, *Public Health Order*, at 3-7 (Sept. 18, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/09/091820-PHO.pdf.

Following a brief "reset" period in November 2020 in which all non-essential businesses were again ordered to cease most in-person operations,[12] the PHOs began allowing non-essential businesses and non-profits to operate at various capacities depending on the prevalence of the virus in their respective counties, as measured by the average number of new cases each day, weekly test positivity rates, and (as of April 28, 2021) vaccination rates.[13] In general, counties are assigned to the least restrictive level (Turquoise) if they have (1) a new COVID-19 case incidence rate less than 10 cases per 100,000 inhabitants, (2) an average percent of positive COVID-19 test results less than 7.5% over the most recent 14-day period, and (3) a certain percentage of their vaccine-eligible population fully-vaccinated; the next least restrictive level (Green) if they meet two of those criteria; the next level (Yellow) if they meet one; and the most restrictive level (Red) if they fail to meet any. *See id.*

As relevant to this case, the current PHO (as have previous ones) allows most non-essential businesses and non-profits—including essential "retail spaces" like grocery stores, retail banks, and pharmacies—to operate up to 25% of maximum capacity (both indoor and outdoor) in Red counties, 33% of maximum capacity in Yellow counties, 50% of maximum capacity in Green counties, and 75% of maximum indoor capacity and 100% of outdoor capacity in Turquoise counties. *Id.* at 7-12. The PHO continues to impose additional restrictions and capacity limits for other businesses and non-profits posing heightened risks of transmission. "Food and drink establishments," which include "restaurants, breweries, wineries, distillers, cafes, coffee shops, or

---

[12] *See, e.g.*, N.M. Dep't of Health, *Public Health Order* (Nov. 18, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/11/111820-PHO.pdf.

[13] N.M. Dep't of Health, *Public Health Order* at 6-7 (Apr. 28, 2021), https://cv.nmhealth.org/wp-content/uploads/2021/04/NCOV-PHO-Amendment-20210428.pdf [hereinafter April 28 Order].

other similar establishments that offer food or drink"[14] must abide by strict requirements and may only operate up to 25% of maximum capacity for outdoor spaces in Red counties; 33%/75% of maximum capacity for indoor spaces and outdoor spaces, respectively, in Yellow counties; 50%/75% of maximum capacity for indoor spaces and outdoor spaces, respectively, in Green counties; and 75% of maximum capacity for both indoor and outdoor spaces in Turquoise counties. *Id.* Similarly, "bars and clubs"—which are defined as "any business, other than those specifically defined as a 'food and drink establishment,' that typically or actually generates more than half of its revenue from the sale of alcohol for on-premises consumption, as well as adult entertainment venues, nightclubs, and dance clubs, regardless of the source of their revenue"—may only operate as such up to 25% of maximum capacity for outdoor spaces in Green counties and 33%/75% of maximum capacity for indoor spaces and outdoor spaces, respectively, in Turquoise counties. *Id.* at 3, 7-12. Beginning this Friday, the vast majority of counties will either be in Green or Turquoise.[15]

### III.    Plaintiffs' claims in this case

Against this factual backdrop, Plaintiffs filed the instant § 1983 action. Plaintiffs, the New Mexico Elks Association, the Fraternal Order of Eagles, and the Loyal Order of the Moose International, are three fraternal organizations that operate "lodges" or "aeries" throughout the state. Compl. at ¶¶ 1-3, 11-13. Plaintiffs allege (inaccurately, as explained below) that Defendants,

---

[14] The PHO specifically defines "breweries" as "businesses licensed pursuant to NMSA 1978, Section 60-6A-26.1," "distillers" as "businesses licensed pursuant to NMSA 1978, Section 60-6A-1," and "wineries" as "businesses licensed pursuant to NMSA 1978, Section 60-A-11."

[15] *Gov: State preparing to open end of June, with anticipated 60% vaccination rate*, KRQE (Apr. 28, 2021), https://www.krqe.com/health/coronavirus-new-mexico/new-mexico-officials-to-provide-covid-19-update-2/ [hereinafter Reopening Announcement]

through the PHO, have required their organizations to remain closed throughout the pandemic. *Id.* at ¶¶ 17-18, 24. Plaintiffs generally allege that this ostensible total prohibition on Plaintiffs' operations violates their rights to substantive and procedural due process, equal protection, and assembly. *Id.* at 5-8. In their prayer for relief, Plaintiffs request a declaratory judgment that the PHOs are unconstitutional and further request a temporary restraining order (TRO) and a preliminary and permanent injunction "prohibit[ing] Defendants from enforcing the public health orders in the arbitrary and capricious manner and fashion engaged by Defendants that keeps organizations like Plaintiffs closed and unable to even open under similar conditions and restrictions as other organizations." *Id.* at 8-9. Plaintiffs also seek compensatory and punitive damages for their alleged injuries. *Id.* at 9. Plaintiffs did not file a separate petition or motion for a TRO or preliminary injunction but merely submitted an information sheet for TRO. [Doc. 2]

## IV.    Plaintiffs have been (and currently are) permitted to assemble and fundraise

To accurately rule on Plaintiffs' requested preliminary injunctive relief, it is useful for this Court to understand the applicable restrictions to which Plaintiffs are subject. It is unclear from the Complaint exactly what PHO category Plaintiffs believe their non-profits fall under or exactly which businesses they believe are being treated more favorably and how.[16] Given Plaintiffs' allegations that their "organizations have been required to remain closed," Compl. at ¶¶ 17-18, 24, Defendants assume Plaintiffs' believe their organizations fall under the "bars and clubs" category because they "typically or actually generate[] more than half of [their] revenue from the sale of alcohol for on-premises consumption[.]" April 28 Order, *supra* note 13 at 3. Even if true, Plaintiffs'

---

[16] At one point, Plaintiffs refer to themselves as "recreational facilities," Compl. ¶ 47, but Defendants have never considered fraternal organizations as such. Rather, this appears to be a typo resulting from Plaintiffs' counsel's copy-and-pasting of much of the Complaint from another he filed in *Hinkle Family Fun Center, LLC v. Lujan Grisham*, No. 1:20-cv-01025-MV-KK.

organizations have not "been required to remain closed." To the contrary, the State has previously communicated to all non-profit organizations that hold "club" liquor licenses, *see* NMSA 1978, § 60-3A-3(E) (2019), that other operations of their organizations are permitted to operate under the PHOs' "catchall" category provisions, which allow operations in every county.[17] Defendants have also clarified this in the State's "Covid-Safe Practices" document, which contains additional requirements and guidelines for specific businesses and activities in addition to the PHOs' requirements.[18] Specifically, the Covid-Safe Practices applicable to "food and drink establishments" and "bars and clubs" provides:

> Non-profits licensed to serve food and/or alcohol are subject to these requirements, as well as the capacity restrictions provided in the state Public Health Order for restaurants and bars, only to the extent they provide food and/or alcohol service.  Other activities unrelated to the service of food and/or alcohol organized by the non-profit may take place subject to other applicable Covid-Safe Practices and the state Public Health Order's capacity restrictions for the applicable category or the "catchall" category.

*Id.* at 13. Accordingly, Plaintiffs' members are allowed to assemble and fundraise at various capacities depending on the county's status; they are only prohibited from offering alcohol service in Yellow and Red counties. April 28 Order, *supra* note 13 at 7-12.

## DISCUSSION

I.  **Plaintiffs are not entitled to any of the injunctive relief they seek because they failed to sue Defendants in their official capacities**

---

[17] *See, e.g.*, Letter from Andrew Vallejos, Dir., Alcoholic Beverage Control, to Club Licensees (Mar. 4, 2021), http://rld.state.nm.us/uploads/files/Alcohol%20and%20Gaming/Letter%20to%20Clubs%20reopening.pdf.

[18] Dep't of Health, *All Together New Mexico: COVID-Safe Practices for Individuals and Employers* (Apr. 26, 2021), https://indd.adobe.com/view/3f732e94-0164-424d-9ac6-a0ace27e70c8.

As an initial matter, it should be noted Plaintiffs have only sued Defendants in their *individual* capacities. *See* Compl. at 1 (stating that Defendants are being sued "Individually, Acting Under the Color of Law").[19] Yet Plaintiffs seek injunctive relief that Defendants could only grant in their *official* capacities. *See* Compl. at 8-9; *cf. Kuck v. Danaher*, 822 F. Supp. 2d 109, 148 (D. Conn. 2011) ("Plaintiffs have failed to name a proper defendant who would be able to provide prospective injunctive relief in connection with the appeals backlog since Plaintiffs cannot obtain prospective injunctive relief from individual capacity defendants. Plaintiffs could only obtain prospective injunction relief if they sued an official capacity defendant who could meet the requirements under *Ex-parte Young*."). Plaintiffs must therefore amend their Complaint to sue Defendants in their official capacities should they wish for the Court to consider the merits of their request for preliminary injunctive relief. *See Smith v. Plati*, 56 F.Supp.2d 1195, 1203 (D.Colo.1999) (dismissing claims against state official in his individual capacity because the relief plaintiff requested could only be obtained against the defendant in his official capacity).

## II.   Even if Plaintiffs sued Defendants in their proper capacities, the Court should deny Plaintiffs' request for preliminary injunctive relief

### A.   Standard of review for a TRO and preliminary injunction[20]

---

[19] Plaintiffs' counsel has previously used this phrase to indicate he is suing an official solely in his individual capacity. *See e.g.*, *De Gutierrez v. Albuquerque Pub. Sch.*, No. 18 CV 00077 JAP/KBM, 2018 U.S. Dist. LEXIS 129717, at *1 (D.N.M. July 31, 2018) (suing some officials "individually acting under color of law" and another "individually and in his official capacity").

[20] The Court should treat Plaintiffs' request for a TRO as a request for a preliminary injunction. *See* 13 Moore's Federal Practice § 65.31 (2020) ("[W]hen a temporary restraining order is sought on notice to the adverse party, it may be treated by the court as a motion for a preliminary injunction."); *see also Peterson v. Kunkel*, 492 F. Supp. 3d 1183, 2020 U.S. Dist. LEXIS 183471, at *11-12 (D.N.M. 2020) (Johnson, C.J.) (treating request for TRO as request for preliminary injunction when Defendants had the opportunity to file a response in opposition and appeared at hearing). Nonetheless, whether the Court treats Plaintiffs' request as one for a TRO or one for a preliminary injunction, the standard is the same. *See Firebird Structures, LCC v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1505*, 252 F. Supp. 3d 1132, 1156 (D.N.M. 2017)

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (internal quotation marks and citation omitted). To obtain a TRO or preliminary injunction, the moving party must demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *AG of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009) (internal quotation marks and citation omitted). "The third and fourth factors 'merge' when, like here, the government is the opposing party." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020). Because preliminary injunctive relief is an "extraordinary remedy, . . . the right to relief must be clear and unequivocal." *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir. 2006). The movant *must* satisfy his or her burden for each and every one of these prerequisites. *Diné Citizens Against Ruining Our Env't*, 839 F.3d 1276, 1281 (10th Cir. 2016). Put another way, these prerequisites do not establish a balancing test; each must be satisfied independently, and the strength of one cannot compensate for the weakness of another. *See id.* at 1282 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

Furthermore, "[b]ecause the limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," the Tenth Circuit specifically disfavors "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Schrier v. Univ. of Colorado et.al.*,

("The requirements for the issuance of a TRO are essentially the same as those for the issuance of a preliminary injunction. . . . The primary difference between a TRO and a preliminary injunction is that a TRO may issue without notice to the opposing party and that a TRO is of limited duration." (citations omitted)).

427 F.3d 1252, 1258-59, (10th Cir. 2005) (alterations, internal quotation marks, and citation omitted). Therefore, "any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course[,]" and "a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms[.]" *O Centro Espirita Beneficente Uniao do Vegetal ("O Centro") v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).

Plaintiffs' requested injunctive relief falls into the category of disfavored injunctions. As Plaintiffs did not file a separate motion for preliminary injunctive relief, this Court must assume Plaintiffs are requesting same relief sought in their Complaint: an injunction "[p]rohibit[ing] Defendants from enforcing the public health orders in the arbitrary and capricious manner keeping Plaintiffs' locations closed under similar conditions and restrictions as other businesses." *Compare* Doc. 2, *with* Compl. at 9. Plaintiffs, therefore, seek all the relief they could be awarded at the end of trial on the merits.[21] *See Peterson*, 2020 U.S. Dist. LEXIS 183471, *14 (holding that the plaintiffs' requested preliminary injunction was disfavored because it was an exact overlay of the relief sought in their complaint).

The requested preliminary injunctive relief is also disfavored because it would disrupt the status quo when no "bar or club," such as the ones Plaintiffs apparently operate, has been permitted to fully open since March. *See Schrier*, 427 F.3d at 1260 ("[T]he status quo is the last uncontested

---

[21] That Plaintiffs also seek monetary damages does not compel a different result. *Cf. Strickland v. Madden Sales & Serv.*, No. 19-918 MV/JFR, 2020 U.S. Dist. LEXIS 95430, at *8 (D.N.M. May 8, 2020) (holding that the defendant's motion for a preliminary injunction seeking enforcement of a non-compete agreement was disfavored because it sought all the relief that it could recover at the conclusion of a full trial on the merits and even though it sought monetary damages, the "primary objective" of its counterclaims was to enforce the non-compete agreement).

status between the parties which preceded the controversy until the outcome of the final hearing[.]" (internal quotation marks and citations omitted)); *Peterson*, 2020 U.S. Dist. LEXIS 183471, *14 (holding that the requested preliminary injunction would alter the status quo because it "would allow private schools to conduct in-person learning at a 50% capacity for 7th grade students, an action no public school had been permitted to take since mid-March"). Finally, Plaintiffs request this Court to force Defendants to affirmatively alter the PHO and regulate Plaintiffs' organizations in a different manner. *Cf. ETP Rio Rancho Park, LLC v. Grisham*, No. CIV 21-0092 JB/KK, 2021 U.S. Dist. LEXIS 36354, at **55, 112 (D.N.M. Feb. 26, 2021) (Browning, J.) (noting that the plaintiffs' request "to prohibit Defendants from enforcing all PHOs" required affirmative action and was therefore disfavored). Thus, this Court should closely scrutinize Plaintiffs' request for preliminary injunctive relief and require Plaintiffs to "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms[.]" *O Centro*, 389 F.3d at 975.

### B. Special considerations for issuing TRO or preliminary injunction interfering with a state's response to the COVID-19 pandemic

Over one hundred years ago, the Supreme Court declared, "[A] community has the right to protect itself against an epidemic of disease which threatens its members," and judicial scrutiny should be limited to laws that have "no real or substantial relation to" that purpose. *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905). This principle stands no less true today.  Navigating the once-in-a-lifetime health crisis arising from the COVID-19 pandemic necessarily requires difficult choices, but these tough decisions must be made in order to protect the health and safety of the public. In *South Bay United Pentecostal Church v. Newsom*, a majority of the justices declined to enjoin a California executive order limiting attendance at religious institutions in light of COVID-19. 140 S. Ct. 1613 (2020). Relying on *Jacobson*, Chief Justice Roberts observed, "The precise

question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" 140 S. Ct. at 1613 (Roberts, C.J., concurring) (quoting *Jacobson*, 197 U.S. at 38). "When those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad[,]'" he continued, "Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.* (quoting *Marshall v. United States*, 414 U. S. 417, 427 (1974) and *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 545 (1985)).

Most recently, the Supreme Court issued a summary, per curium opinion granting temporary injunctive relief prohibiting enforcement of New York's 10- and 25-person occupancy cap specifically imposed only on houses of worship when many, if not all, secular businesses had no occupancy cap at all in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 208 L. Ed. 2d 206, 207 (U.S. 2020). However, in deciding to grant temporary injunctive relief against enforcement of these occupancy caps, the Court did not even come close to casting doubt on the ability of elected officials to restrict certain secular businesses more than others. The main, per curium opinion of the Court does not even mention *Jacobson* or otherwise indicate that Courts should be deferential outside the realm of the First Amendment. *See Roman Catholic Diocese of Brooklyn*, 208 L. Ed. 2d at 207-11. To the contrary, the Court stated, "Members of this Court are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area." *Id.* at 210. And while Justice Gorsuch's solo concurrence takes aim at *Jacobson*'s generally deferential standard—and Chief Justice Roberts' reliance on it in S. *Bay United*

*Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020)—even Justice Gorsuch acknowledged that *Jacobson* remains the proper standard when the public health emergency measures do not infringe upon an expressly guaranteed fundamental right. *See Roman Catholic Diocese of Brooklyn*, 208 L. Ed. 2d at 211-12 (Gorsuch, J. concurring) ("Although *Jacobson* pre-dated the modern tiers of scrutiny, this Court essentially applied rational basis review . . . . Rational basis review is the test this Court normally applies to Fourteenth Amendment challenges, so long as they do not involve suspect classifications based on race or some other ground, or a claim of fundamental right.").

Indeed, relying on the above, the Honorable James O. Browning just recently concluded that "*Jacobson* . . . provides the Court with guidance how to apply tiered scrutiny in the public health emergency context[,]" and therefore,

> if there has been no "plain, palpable invasion of rights secured by the fundamental law"—such as discrimination based on a suspect class or violation of a fundamental right under the Constitution—the Court will evaluate whether the law or policy in question has a "real or substantial relation" to the State's public health objectives—in other words, whether the State has a rational basis for the challenged policy.

*Hernandez*, 2020 U.S. Dist. LEXIS 238477, at *155-56 (D.N.M. Dec. 18, 2020) (quoting *Jacobson*, 197 U.S. at 31); *see also ETP Rio Rancho Park, LLC v. Grisham*, No. CIV 21-0092 JB/KK, 2021 U.S. Dist. LEXIS 23409 (D.N.M. Feb. 8, 2021) (Browning, J.) (applying rational basis review in denying request to enjoin the PHOs' restrictions on business operations).

### C.  Plaintiffs fail to demonstrate a strong likelihood of success on the merits of their claims

#### 1.  Substantive Due Process and Equal Protection

Although the Equal Protection and Due Process clauses protect distinctly different interests, "their substantive analyses converge." *Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004). For substantive due process claims challenging legislative-type actions, such as the PHO,

the Court typically applies a two-part test in which it first asks whether the action implicates a fundamental right. *See Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009). If so, the Court applies strict scrutiny; if not, the Court applies rational basis review. *Id.* Similarly, in considering equal protection claims, the Court will apply rational basis review unless the classification at issue discriminates against a suspect class. *See Curley v. Perry*, 246 F.3d 1278, 1285 (10th Cir. 2001). The PHO's requirement that bars and clubs remain closed in the red and yellow level counties does not violate equal protection or substantive due process because it does not discriminate against a suspect class, it does not infringe on a fundamental right, and it is rationally related to a compelling government interest.

### a.   The PHO's closure of "close-contact recreational facilities" such as trampoline parks is subject to rational basis review

#### i.   Equal Protection

Plaintiffs claim that easing restrictions for some businesses and organizations but not their similarly situated fraternal organizations violates the Equal Protection Clause. *See* Compl. at 7-8. The Fourteenth Amendment prevents any state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV. The Equal Protection Clause "creates no substantive rights. Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799 (1997) (internal citations omitted). As explained below, the Court must apply rational basis review when evaluating the PHO's restrictions for fraternal organizations, specifically bars and clubs.

First, Plaintiffs' equal protection claim fails because they do not allege that Defendants intentionally discriminated against fraternal organizations in the PHO. *See generally* Compl. The PHO is facially neutral since it requires other businesses other than fraternal organizations to remain closed. *Cf. ETP Rio Rancho Park*, 2021 U.S. Dist. LEXIS 23409, at **138-39 (citing

16

*Romer v. Evans*, 517 U.S. 620, 632 (1996)); *see generally* April 28 Order, *supra*, note 13. Therefore, Plaintiffs must make out a prima facie case of discriminatory animus toward fraternal organizations. *Id.* (citing *Washington v. Davis*, 426 U.S. 229, 241 (1976)). Discriminatory intent "requires that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of the law's differential treatment of a particular class of persons." *SECSYS, Ltd. Liab. Co. v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012) (internal quotation marks and citation omitted). As the Complaint contains no allegations that the PHO's restrictions are born out of animus toward fraternal organizations, the restrictions do not "run afoul of the Constitution." *Id.*; Compl. at 24-25.

Second, Plaintiffs do not allege (as they cannot) that they are members of a suspect class which would give rise to any sort of heightened scrutiny. *See Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002) (stating governmental classifications are only subject to strict scrutiny if they target a suspect class such as race or national origin and intermediate scrutiny is applied to quasi-suspect classes like gender). Third, as described in the following section, there is no fundamental right "to pursue lawful employment" or "be free from governmental interference." Compl. at 5-6; *see* discussion, *infra*, Section II(C)(2)(ii). Nor does the PHO impermissibly infringe on Plaintiffs' freedom of association. *See* discussion, *infra*, Section II(C)(3). Thus, the Court must use rational basis review when reviewing Plaintiffs' claims that the limitations on Plaintiffs' ability to serve alcohol is arbitrary.

### ii.    Substantive Due Process

Similarly, the Court must assess Plaintiffs' substantive due process claims under rational basis review, as there is no fundamental right raised in the Complaint. "Substantive due process bars 'certain government actions regardless of the fairness of the procedures used to implement

them.'" *Brown v. Montoya*, 662 F.3d 1152, 1172 (10th Cir. 2011) (internal quotation marks and citation omitted). There are two types of substantive due process claims: (1) claims that the government has infringed a fundamental right and (2) claims that government action deprived a person of life, liberty, or property in a manner so arbitrary it shocks the judicial conscience. *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019). "[Courts] apply the fundamental-rights approach when the plaintiff challenges legislative action, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious executive action." *Id.* (alterations, internal quotation marks, and citation omitted).

The fundamental-rights approach is applicable in this case, as the PHO is a quasi-legislative action generally applicable to all of New Mexico and it is the Department of Health's attempt to "through policy, to achieve a stated government purpose."[22] *Abdi v. Wray*, 942 F.3d 1019, 1027-28 & n.1 (10th Cir. 2019); *cf. Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 n.1 (3d Cir. 2000)

---

[22] Even if the "shocks conscience" standard applied in this case, Plaintiffs' claim would still fail. "Executive action that shocks the conscience requires much more than negligence." *Woodard*, 912 F.3d at 1300. "Even the actions of a reckless official or one bent on injuring a person do not necessarily shock the conscience." *Id.* "Conduct that shocks the judicial conscience is deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice." *Id.* (internal quotation marks omitted). "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employed it as an instrument of oppression." *Id.* "The behavior complained of must be egregious and outrageous." *Id.* (citing *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957)). Issuing public health orders closing or restricting certain high-risk businesses to stop the spread of a deadly virus can hardly be considered conscious-shocking. *See World Gym, Inc. v. Baker*, Civil Action No. 20-cv-11162-DJC, 2020 U.S. Dist. LEXIS 131236, at *12 (D. Mass. July 24, 2020) ("In light of the toll of the pandemic, [the plaintiffs' argument that the governor's COVID-19-related orders shock the conscious] is unconvincing. The state has a strong interest in stopping the spread of COVID-19, and accordingly, it cannot be said that the Governor's conduct amounts conscience-shocking action."). As one court bluntly observed, "the notion that restrictions designed to save human lives are 'conscious shocking' [is] absurd and not worthy of serious discussion." *Herrin v. Reeves*, No. 3:20cv263-MPM-RP, 2020 U.S. Dist. LEXIS 176604, at *23 (N.D. Miss. Sep. 25, 2020) (rejecting substantive due process challenge to Governor Reeves' limitation on public gatherings during current pandemic).

("[E]xecutive acts, such as employment decisions, typically apply to one person or to a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society." (internal quotation marks and citation omitted)). Additionally, the fundamental rights approach applies because DOH's "implementation of its official policy is alleged to have caused a substantive due process violation." *Abdi*, 942 F.3d at 1028 n.1.

Legislative action is tested under a two-part substantive due process framework in which the Court asks first asks whether a fundamental right is implicated. *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009). If so, the Court applies strict scrutiny; if not, the Court applies rational basis review. *Id.* The plaintiff bears the burden of providing a "careful description of the asserted fundamental liberty interest" and demonstrating how such a right is "objectively deeply rooted in [the] Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotation marks and citations omitted). Vague, conclusory, or generalized assertions will not suffice. *See ETP Rio Rancho Park*, 2021 U.S. Dist. LEXIS 36354, at *119.

Plaintiffs' alleged rights "to pursue lawful employment" or "be free from governmental interference" are not judicially recognized fundamental rights warranting strict scrutiny. *See* Compl. at 5-6. It is well established that "[t]he right to 'make a living' is not a 'fundamental right,' for either equal protection or substantive due process purposes." *Medeiros v. Vincent*, 431 F.3d 25, 32 (1st Cir. 2005); *see Guttman v. Khalsa*, 669 F.3d 1101, 1118 (10th Cir. 2012) (holding that a right to practice in one's chosen profession is not fundamental)*.* Additionally, the "Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a

calling, may be conditioned." *Nebbia v. New York*, 291 U.S. 502, 527-528 (1934). Recently, Judge Browning ruled that trampoline parks' alleged right to run a business free from State interference was not a fundamental right. *ETP Rio Rancho Park*, 2021 U.S. Dist. LEXIS 36354, at *117-18.[23]

Other federal courts have similarly rejected substantive due process challenges to COVID-19 restrictions on the basis that there is no fundamental right to operate a business. For example, in *Xponential Fitness v. Arizona*, the plaintiffs asserted that an executive order closing their businesses violated their due process rights. 2020 U.S. Dist. LEXIS 123379 at *16 (D. Ariz. July 14, 2020). The court disagreed that the order implicated any due process concerns because the "right to do business has not been recognized as a constitutionally-protected property right." *Id.* In *Talleywhacker, Inc. v. Cooper*, the court applied the same legal reasoning in rejecting the due process claims of owners of entertainment venues in North Carolina who challenged orders closing their business due to COVID-19. 465 F. Supp. 3d 523, 541-42 (E.D.N.C. June 8, 2020). Several other courts have followed suit. *See, e.g.*, *In SH3 Health Consulting, LLC v. Page*, No. 4:20-cv-00605 SRC, 2020 U.S. Dist. LEXIS 81433, at *28 (E.D. Mo. May 8, 2020); *910 E Main L L C v. Edwards*, No. 6:20-CV-00965, 2020 U.S. Dist. LEXIS 152366, at *22 (W.D. La. Aug. 21, 2020); *Paradise Concepts, Inc. v. Wolf*, No. 20-2161, 2020 U.S. Dist. LEXIS 157250, at *9 (E.D. Pa. Aug. 31, 2020). Most recently, in *Kelley O'Neil's Inc. v. Ige*, 2021 U.S. Dist. LEXIS 36260, *20-25 (D. Haw. February 26, 2021), the court refused to enjoin an executive order requiring the closure of bars and nightclubs to slow the spread of COVID-19 in Hawaii. As discussed below, Plaintiffs give this Court no reason to reach a different result.

---

[23] Furthermore, in New Mexico a liquor license is not a property right; it is a privilege which is subject to regulations. *Chronis v. State*, 1983-NMSC-081, ¶¶ 9-10, 100 N.M. 342, 670 P.2d 953 ("This Court has repeatedly held that a liquor license is a privilege subject to regulation and not a property right.").

b.    **The PHO's closure of "bars and clubs" is rationally related to a compelling government interest in combatting the spread of COVID-19**

To survive rational basis review, "the [law] need only be rationally related to a legitimate government purpose." *See Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002). In challenging a governmental action for want of a rational basis, "the burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the [law]." *Bd. of Trs. v. Garrett*, 531 U.S. 356, 367 (2001) (internal quotation marks and citation omitted). "Th[e] standard is objective—if there is a reasonable justification for the challenged action, [the court] do[es] not inquire into the government actor's actual motivations." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011). "[R]ational-basis review does not give courts the option to speculate as to whether some other scheme could have better regulated the evils in question." *Powers v. Harris*, 379 F.3d 1208, 1217 (10th Cir. 2004). Courts "will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish or because the statute's classifications lack razor-sharp precision. *Id.* (citations omitted). "Nor can [a court] overturn a statute on the basis that no empirical evidence supports the assumptions underlying the legislative choice." *Id.*; *see also League of Indep. Fitness Facilities & Trainers*, 814 Fed. Appx. 125, 128 (6th Cir. 2020) ("Under [rational basis review], the Governor's action [closing businesses in light of COVID-19 pandemic] 'is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" (quoting *FCC v. Beach Commc'ns*, 508 U.S. 307, 315 (1993)). Indeed, rational basis scrutiny is so deferential that courts "must independently consider whether there is any conceivable rational basis for the classification, regardless of whether the reason

ultimately relied on is provided by the parties." *Teigen v. Renfrow*, 511 F.3d 1072, 1084 (10th Cir. 2007) (alterations, internal quotation marks, and citation omitted).

As an initial matter, it is undisputed that Defendants have a rational, indeed *compelling*, interest in stemming the spread of COVID-19. *See Roman Catholic Diocese*, 141 S. Ct. at 67. Plaintiffs contend that Defendants' limitations regarding their operation have "no basis in science and is arbitrary and capricious," however, these allegations are threadbare at best. *See* Compl. at 4. But as Judge Browning recently observed, "The more closely a person interacts with others and the longer that interaction, the higher the risk of COVID-19 spread." *ETP Rio Rancho Park*, 2021 U.S. Dist. LEXIS 23409 at *110 (internal quotation marks and citation omitted). Given this, it is reasonable that the State would seek to restrict the operation of locations where members of the public are likely to come within close proximity to one another.

This is especially necessary in bars and clubs because people cannot simultaneously drink and wear a mask. Further, a bar presents a greater risk of COVID-19 transmission than other businesses because it is an enclosed space where people socialize without masks due to consuming alcohol for an extended period of time, whereas restaurant patrons typically conduct the limited activity of eating a meal.[24] Additionally, bar and club patrons are, by definition, more likely to

---

[24] *See e.g.*, Niamh Fitzgerald et al., *Managing COVID-19 Transmission Risks in Bars: An Interview and Observation Study*, J. of Studies on Alcohol and Drugs (2021), https://www.jsad.com/doi/pdf/10.15288/jsad.2021.82.42; Caitlin Rivers, et al., *Public Health Principles for a Phased Reopening During COVID-19: Guidance for Governors*, John Hopkins Bloomberg School of Public Health (Apr. 17, 2020), https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2020/200417-reopening-guidance-governors.pdf (concluding that nonessential businesses like bar have high contact intensity and a high number of contacts); Stephanie Soucheray, *More evidence points to bars adding to COVID-19 spread*, Center for Infectious Disease Research and Policy (Sept. 15, 2020), https://www.cidrap.umn.edu/news-perspective/2020/09/more-evidence-points-bars-adding-covid-19-spread; *Why Bars Continue to Be High-Risk Environments for COVID-19*, Healthline, https://www.healthline.com/health-news/why-bars-continue-to-be-high-risk-environments-for-covid-19 (last visited Apr. 28, 2021). It is for these It is for these reasons that airlines suspended all or part of the sale of alcohol during

drink alcohol. Bars and clubs also present an increased risk for COVID-19 because people from different households interact and mingle in bars whereas in a restaurant-goers typically stay with their group at reserved tables. *See id.* Further, the consumption of alcohol is likely to lower patrons' inhibitions and decrease likelihood of following COVID-19 protocols. *See id.*

Courts across the country have ruled that orders limiting the operations of bars for similar reasons met the standard for rational basis review. *See, e.g.*, *Kelley O'Neil's Inc.*, 2021 U.S. Dist. LEXIS 36260; *Ricky Dean's v. Marcellino*, 2020 U.S. Dist. LEXIS 216635, *2 (D. Kan. November 19, 2020) (upholding orders limiting business hours of restaurants and bars with liquor licenses). The Fifth Circuit recently upheld two district court orders denying injunctive relief regarding Louisiana's Bar Closure Order which prohibited certain liquor licensees from operating. *See Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456 (5th Cir. 2021). The court reasoned that even "if the Bar Closure Order's classifications are based solely on the premise that venues whose primary purpose and revenue are driven by alcohol sales rather than food sales are more likely to increase the spread of COVID-19, such a rationale . . . is sufficiently 'plausible' and not 'irrational.'" *Id.* at 470. The PHO's restrictions for "bars and clubs" are even more tailored than the restrictions in *Big Tyme*, allowing these locations to serve alcohol depending on the virus' prevalence in each county. *See* April 28 Order at 6-13. Indeed, beginning this Friday, most bars will be able to open at some capacity. *See* Reopening Announcement, *supra* note 15.

To the extent Plaintiffs complain about the PHO's distinction between essential businesses and non-essential businesses, *see* Compl. at ¶ 23, such a distinction represents Defendants'

---

flights in order to prevent customers unnecessarily lingering over their drinks. Maureen O'Hara, *Airlines ban alcohol on planes in response to COVID-19*, CNN (June 16, 2020), https://www.cnn.com/travel/article/alcohol-ban-airlines-covid-19/index.html.

judgment—based on science and plain common sense—that some activities are necessary to run society during a pandemic. The services provided at hospitals, daycares, funeral homes, homeless shelters, grocery stores, banks, and pharmacies are vital for New Mexicans to survive this once-in-a-lifetime pandemic. *See Legacy Church, Inc. v. Kunkel*, 455 F. Supp. 3d 1100, 1159-60 (D.N.M. 2020) (discussing how the services and goods provided by essential businesses under the PHO are necessary). Plaintiffs' ability to serve alcohol is simply not critical for everyday life or to prevail against the pandemic. Nor have Plaintiffs even attempted to demonstrate that any essential business is a proper comparator for an equal protection claim. *Cf. Moxie Owl, Inc. v. Cuomo*, No. 1:21-cv-194 (MAD/DJS), 2021 U.S. Dist. LEXIS 75138, at *8 (N.D.N.Y. Mar. 18, 2021). Despite this, Plaintiffs' organizations are subject to the same capacity restrictions as essential "retail spaces" for other activities. *See* April 28 Order at 6-13. Contrary to Plaintiffs' allegations, their occupancy limits are greater than or the same as restaurants, golf courses, gyms, and country clubs. *Id.* The only difference is that Plaintiffs' bar area is subject to the same restrictions as all "bars and clubs" because these businesses pose a heighten risk for the transmission of the virus.

While Plaintiffs' may complain that the PHOs' restrictions are underinclusive or ill-tailored because they do not also close restaurants or other businesses, this is no reason for this Court to invalidate them. *Legacy Church, Inc.*, 455 F. Supp. 3d at 1154 n.12 (Browning, J.) ("The government need not choose between doing nothing in the face of a pandemic and closing all of society."); *see also Jacobson*, 197 U.S. at 38; *Kitchen*, 755 F.3d at 1237; *cf. Xponential Fitness v. Arizona*, No. CV-20-01310-PHX-DJH, 2020 U.S. Dist. LEXIS 123379, at *23 (D. Ariz. July 14, 2020) ("Plaintiffs' frustrations that the June 29, 2020 Executive Order does not close every business in which the virus might easily spread is also understandable; however, the Order need not be the most effective or least restrictive measure possible to attempt to stem the spread of

COVID-19 to be rational."); *Talleywhacker*, 465 F. Supp. 3d 523 (holding that the North Carolina governor's executive order requiring entertainment and fitness facilities to remain closed, but allowing restaurants, breweries, wineries, distilleries, personal care businesses, grooming businesses , and tattoo parlors to open survived rational basis review despite similarities between closed and open businesses). Accordingly, Plaintiffs cannot succeed on their equal protection and substantive due process claims.

### 2. Procedural Due Process

Plaintiffs next claim Defendants violated Plaintiffs' right to procedural due process under the Fourteenth Amendment. *See* Compl. at 6. To prevail on this claim, "[Plaintiffs] must show (1) the state deprived him of a protected interest in liberty or property and (2) he was not afforded an appropriate level of process[.]" *Leek v. Miller*, 698 Fed. Appx. 922, 927 (10th Cir. 2017) (internal quotation marks and citation omitted). Again, Plaintiffs fail to show, even prima facie, that they have been deprived of a protected interest. Further, Plaintiffs cannot demonstrate that they are entitled to process in response to the challenged legislative action.

As a threshold matter, Plaintiffs cannot establish that the PHOs deprived them of a protected interest in liberty or property. Plaintiffs fail to identify with any specificity the protected liberty interest at issue. *See* Compl. at 6. To the extent Plaintiffs are reiterating their claims that they have been deprived of a right to make a living or run a non-profit free from regulation, that issue has been addressed above. *See* discussion, *supra* Section II(C)(1(a)(ii)); *see also Kerry v. Din*, 576 U.S. 86, 99 (2015) (rejecting the dissent's position that "the term 'liberty' in the Due Process Clause includes implied rights that, although not so fundamental as to deserve substantive-due-process protection, are important enough to deserve procedural-due-process protection"). Further, the Supreme Court has ruled that the "activity of doing business, or the activity of making

a profit is not property in the ordinary sense" and is therefore not a protected interest for purposes of procedural due process claims. *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999); *see also Balt. Air Transp., Inc. v. Jackson*, 419 Fed. Appx. 932, 937 (11th Cir. 2011) (holding that "no constitutional right is implicated by a complaint that asserts a property interest in maintaining a business or earning a profit" (citing *College Sav. Bank*, 527 U.S. at 676)). It follows that the activity of running a *non-profit* is similarly lacking as a protected interest. Lastly, to the extent Plaintiffs claim they have been deprived of their right to assemble, such a claim lacks merit, as discussed below. *See* discussion, *infra* Section II(C)(3).

Yet even assuming, *arguendo*, Plaintiffs could establish a protected liberty or property interest under the first inquiry, a procedural due process violation will not lie when the underlying governmental action affects a general class of persons. *See Okla. Educ. Ass'n v. Alcoholic Beverage Laws Enf't Comm'n*, 889 F.2d 929, 936 (10th Cir. 1989) ("When the legislature passes a law which affects a general class of persons, those persons have all received procedural due process—the legislative process."); *see also 75 Acres, LLC v. Miami-Dade Cty.*, 338 F.3d 1288, 1294 (11th Cir. 2003) ("[I]f government action is viewed as legislative in nature, property owners generally are not entitled to procedural due process."); *Richardson v. Town of Eastover*, 922 F.2d 1152, 1158 (4th Cir. 1991) ("[I]f a town's action is legislative, an affected party has no right to notice and an opportunity to be heard.").

Although this exception typically applies to laws passed by Congress or state legislatures, courts have applied this exception based only on whether the action applies to a larger segment of the population rather than a limited number of individuals. *See, e.g.*, *Curlott v. Campbell*, 598 F.2d 1175, 1181 (9th Cir. 1979) ("At the outset we doubt very much that procedural due process prior to reduction of benefits is required when an agency makes a broadly applicable, legislative-type

decision." (citing *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441 (1915)). Following this principle, courts have held that executive orders issued in response to the current pandemic were legislative in nature, and therefore, did not implicate procedural due process. *See, e.g.*, *Carmichael v. Ige*, No. 20-00273 JAO-WRP, 2020 U.S. Dist. LEXIS 116860, at *29 (D. Haw. July 2, 2020) ("Moreover, because the Emergency Proclamations affect the entire State, they do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient." (internal quotation marks and citation omitted)); *cf. Hernandez*, No. CIV 20-0942 JB/GBW, at 154 (holding that the New Mexico Public Education Department's school reentry plan was "quasi-legislative" and therefore, the plaintiffs were likely not entitled to procedural due process). Indeed, both Judge Browning and Chief Judge Johnson have already held that the same PHOs' capacity restrictions are legislative in nature because they affect the entire state and apply to thousands of businesses and, therefore, not subject to any procedural due process claim because they affect a general population. *See ETP Rio Rancho*, 2021 U.S. Dist. LEXIS 36354, at **149-51; *Peterson*, 2020 U.S. Dist. LEXIS 183471, *25-26. Respectfully, this Court should likewise hold that Plaintiffs are not entitled to procedural due process with regard to the issuance of the PHOs.

### 3.    Right to Assemble

Finally, Plaintiffs claim the PHOs have unconstitutionally interfered with their right to assemble. *See* Compl. at 8. Both "the Supreme Court and the Tenth Circuit have conflated and rephrased associational and assembly rights as the 'freedom to expressive association.'" *Legacy Church, Inc.*, 472 F. Supp. 3d at 1051 (quoting *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 658 (10th Cir. 2006). Accordingly, the Tenth Circuit has treated claimed violations of freedom to associate and assemble as a single claim to be analyzed as a claim to

freedom of expressive association. *Id.* at 1019. "Expressive association is the 'right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.'" *Id.* at 1020 (quoting *Schalk v. Gallemore*, 906 F.2d 491, 498 (10th Cir. 1990)). "Expressive association is not, however, an absolute right, because 'there may be countervailing principles that prevail over the right of association.'" *Id.* (quoting *Grace United Methodist Church*, 451 F.3d at 658).

In evaluating Plaintiffs' expressive association claim, the initial inquiry is whether the group engages in expressive association. *See A.M. v. N.M. Dep't of Health*, 117 F. Supp. 3d 1220, 1258 (D.N.M. 2015). While "[t]he First Amendment's protections of expressive association is not reserved for advocacy groups," a group claiming protection "must engage in some form of expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). In other words, "[b]ecause 'there is no generalized right of free association,' courts only 'recognize[] a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.'" *Legacy Church, Inc.*, 472 F. Supp. 3d at 1054 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984)).

Here, Plaintiffs do not allege that they engage in any activities protected by the right to expressive association. *See generally* Compl. Indeed, courts have held that fraternal organizations like the Fraternal Order of Eagles have no right to assemble because they do not engage in activities protected by the First Amendment. For example, in *Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 244 (6th Cir. 1990), in rejecting the Eagles' freedom of association claim, the Sixth Circuit observed that "[t]he group is a private drinking club with some recreational activities that runs its cash bar and banquet hall as a quasi-business ventures" and "has no political purpose that would require First Amendment protection." Similarly, here, Plaintiffs do not allege they associate to take

a position on any public issues or otherwise engage in protected activities but merely provide general mission statements focused on promoting fraternity and fellowship. *See* Compl. at ¶¶ 11-13. This is not enough. *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes . . . such a kernel is not sufficient to bring the activity within the protection of the First Amendment."). Rather, Plaintiffs' claims are more akin to "a generalized right of social association," which the Supreme Court has held finds no protection under the First Amendment. *See id.* (ruling that dance hall patrons could not establish they were entitled to First Amendment protection because, *inter alia*, there was no suggestion "that [they] [took] positions on public questions"); *see also Schultz v. Wilson*, 304 Fed. Appx. 116, 120 (3d Cir. 2008) ("A social group is not protected unless it engages in expressive activity such as taking a stance on an issue of public, political, social, or cultural importance.") (citing *Pi Lambda Phi Fraternity v. University of Pittsburgh*, 229 F.3d 435, 444 (3d Cir. 2000)). And perhaps most importantly, Plaintiffs *can* assemble at any club location they wish. *See* background, *supra* Section IV.

Assuming, *arguendo*, Plaintiffs have a protected expressive associational right, the next step is to determine whether "[i]nfringements on that right [are] justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Legacy Church, Inc.*, 472 F. Supp. 3d at 1022 (quoting *Roberts*, 468 U.S. at 623). Here, it is beyond dispute that "[s]temming the spread of COVID-19 is unquestionably a compelling interest[.]" *Roman Catholic Diocese*, 141 S. Ct. at 67; *ETP Rio Rancho Park, LLC*, 2021 U.S. Dist. LEXIS 23409, at *149-50. Nor is there any allegation that the PHO restrictions are not "unrelated to the suppression of ideas." *Legacy Church, Inc.*, 472 F. Supp. 3d at 1022 (quoting *Roberts*, 468 U.S. at 623); *see generally* Compl.

The only question is whether stemming the spread of COVID-19 could "be achieved through means significantly less restrictive of associational freedoms." *Id.* The answer is "no."

Any time people gather in person, they risk spreading the virus, falling ill, and worse. Nonetheless, the PHO does not totally foreclose Plaintiffs' ability to assemble. To the contrary, the PHO permits Plaintiffs to gather in any club in the State. *See* background, *supra* Section IV. True, a select few businesses essential to an orderly society (unlike Plaintiffs' clubs) may not have any hard-and-fast capacity limits, but this does not render the PHO unconstitutional. *See Legacy Church, Inc.*, 472 F. Supp. 3d at 1076-77 (rejecting a church's expressive association claim despite the fact that the PHO did not impose similar capacity limits on essential businesses). Rather, the operative fact is that, despite the continued risks of in-person gatherings, Defendants have tailored the PHO to permit Plaintiffs to gather. For example, even though Plaintiffs' clubs might technically fall under the definition of "bars and clubs" in the PHO because they "typically or actually generate more than half of [their] revenue from the sale of alcohol for on-premises consumption," April 28 Order, *supra* note 13 at 3, they have been granted the option of operating non-alcohol related aspects of their organizations under the "catchall" category's capacity limits—which are identical to the limits imposed on essential retail spaces like grocery stores and pharmacies. *See* background, *supra* Section IV. The PHO also grants Plaintiffs' clubs greater capacity limits as the prevalence of the virus decreases in their respective counties. Thus, while a few clubs may have a more limited capacity, most clubs can operate up to 75% of maximum capacity. *See id.*

In sum, even if Plaintiffs had a right to expressive association, the PHO does not impermissibly infringe upon that right. *See Amato v. Elicker*, No. 3:20cv464 (MPS), 2021 U.S. Dist. LEXIS 72507, at **2, 19-20 (D. Conn. Apr. 15, 2021) (dismissing freedom of assembly and association claims brought by restaurant owners against a public health order requiring restaurants

serve food and beverages only for off premises consumption because the order did not ban assemblies but merely restricted them and left open ample alternative channels of communication such as online, by telephone, and in small groups outside of the restaurants); *see also Legacy Church, Inc.*, 472 F. Supp. 3d at 1074-78.

### D.    Plaintiffs fail to demonstrate any irreparable harm

Plaintiffs' failure to demonstrate a "strong" likelihood of success on the merits of their claims is determinative to their requested preliminary injunctive relief. *See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) ("[C]ourts have consistently noted that because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." (internal quotation marks and citation omitted); *Amoco Oil Co. v. Rainbow Snow*, Inc., 809 F.2d 656, 664 (10th Cir. 1987) ("As a prerequisite to the granting of a preliminary injunction, the moving party must show, in addition to the likelihood of success on the merits, that it will suffer irreparable injury unless the injunction issues.").

Equally fatal to Plaintiffs' request is their inability to demonstrate any form of irreparable harm required for their requested injunctive relief. *See Schrier*, 427 F.3d at 1267. "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Id.* (internal quotation marks and citations omitted). "Irreparable harm is not harm that is merely serious or substantial." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation marks and citation omitted). Plaintiffs have not established a likelihood of success on the merits of any of their claims, and therefore cannot use a purported constitutional violation as the basis for any irreparable harm. *See Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)

("Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm." (citing *Schrier*, 427 F.3d at 1266). Nor have Plaintiffs explained what, if any, other alleged irreparable harm them may suffer without an immediate injunction. *See generally* Compl. It follows that Plaintiffs fail to demonstrate irreparable harm, and their requested preliminary injunctive relief must be denied.

### E.     The balance of equities and the public interest counsel against granting injunctive relief

Even if Plaintiffs could demonstrate a strong likelihood of success or an irreparable injury, they fail to clearly demonstrate that the threatened injury outweighs the harm that preliminary injunctive relief would cause the public. It cannot be gainsaid that the State (and the public) has a compelling interest in limiting the spread of a deadly, contagious virus. *See Legacy Church, Inc.*, 472 F. Supp. 3d at 1064 ("The public's interest in limiting the COVID-19 outbreak in the State, a compelling interest outweighs the right to gather."). While Defendants sympathize with the economic or social toll continued restrictions might cause Plaintiffs, this cannot outweigh the public's interest in safeguarding lives. *See League of Indep. Fitness Facilities & Trainers*, 814 Fed. Appx. at 129 ("Though Plaintiffs bear the very real risk of losing their businesses, the Governor's interest in combatting COVID-19 is at least equally significant."); *ETP Rio Rancho Park, LLC*, 2021 U.S. Dist. LEXIS 23409, at *153 (concluding that "the threatened injuries—financial injuries and possible permanent business closure—do not outweigh possible damage—increased COVID-19 spread leading to sickness, hospitalizations, and death—to the Defendants").

Notwithstanding the State's admirable progress in vaccine distribution, social distancing remains the most effective means of stemming COVID-19 transmission. Granting Plaintiffs' requested preliminary relief and allowing Plaintiffs to gather and operate bars at full capacity will

likely contribute to the spread of COVID-19. *See League of Indep. Fitness Facilities & Trainers*, 814 Fed. Appx. at 129 ("Enjoining the actions of elected state officials, especially in a situation where an infectious disease can and has spread rapidly, causes irreparable harm."). To date, over 4,000 New Mexicans have succumbed to the virus. *See* N.M. Dep't of Health, *supra* note 3. Twelve sadly passed away just yesterday.[25] Each newly announced death is not simply a statistic, but a mother, a son, a grandfather, a sister. Each one leaves a gaping hole in the lives of their loved ones. Each one deserves protection. These losses are truly irreparable, and the community's interest in preventing more is paramount.

## CONCLUSION

For the foregoing reasons, this Court should deny the Plaintiffs' request for preliminary injunctive relief.

Respectfully submitted,

s/ Holly Agajanian
Holly Agajanian
*Chief General Counsel to*
*Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
Holly.Agajanian@state.nm.us
505-476-2210

Maria S. Dudley
*Associate General Counsel to*
*Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
maria.dudley@state.nm.us
505-476-2210

---

[25] *New Mexico reports 12 new deaths, 181 additional COVID-19 cases*, KOB 4 News (Apr. 28, 2021), https://www.kob.com/new-mexico-news/new-mexico-reports-12-new-deaths-181-additional-covid-19-cases/6088475/.

Kyle P. Duffy
*Associate General Counsel to*
*Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
kyle.duffy@state.nm.us
505-476-2210

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2021, I filed the foregoing via the CM/ECF filing system,

which caused all counsel of record to be served by electronic means.

Respectfully submitted,

*s/ Holly Agajanian*
Holly Agajanian