**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**THE NEW MEXICO ELKS ASSOCIATION,
FRATERNAL ORDER OF EAGLES, NEW MEXICO STATE AERIE,
NEW MEXICO LOYAL ORDER OF THE MOOSE,**

      **Plaintiffs,**

**v.**                                **Case No. 1:21-cv-00354-KG-LF**

**MICHELLE LUJAN GRISHAM,
Individually, Acting Under the Color of Law,
and TRACIE C. COLLINS,
Individually, Acting Under the Color of Law,**

      **Defendants.**

<u>**MOTION TO DISMISS PLAINTIFFS' VERIFIED COMPLAINT**</u>

Defendants Governor Michelle Lujan Grisham and Secretary Tracie C. Collins (collectively, "Defendants"), by and through their counsel of record, hereby submit their motion to dismiss Plaintiffs' Verified Complaint for Civil Rights Violations Under the Fourteenth Amendment to the United States Constitution and Request for Temporary Restraining Order [Doc. 1] ("Complaint" or "Compl") pursuant to Federal Rule of Civil Procedure 12(b)(6). As grounds for this motion, Defendants state as follows.

**INTRODUCTION**

In March of 2020, governors across the nation were forced to issue executive orders limiting business operations in an attempt to slow the spread of a deadly, novel virus. Though difficult, these restrictions were (and are) necessary to save millions of lives. Although there is hope on the horizon with the arrival of vaccines, the spread of COVID-19 persists. Governor Lujan Grisham—as the top elected executive official of New Mexico—in consultation with the State's

top public health experts, must balance public health considerations with economic harm and social wellbeing. Navigating these competing interests is difficult and fraught with uncertainty. It follows that many New Mexicans may disagree with policy decisions made in response to the pandemic. Those disagreements, however, do not give rise to a justiciable legal dispute, and Plaintiffs may not properly transmogrify policy choices into a federal cause of action.

## BACKGROUND

### I.   The rapid and dangerous spread of COVID-19 in New Mexico

Since its emergence, the novel coronavirus 2019, Sars-CoV-2, the virus that causes COVID-19, has spread exponentially across the globe, throughout the United States, and here in New Mexico. The confirmed number of infections in the United States provides a good illustration of this spread. There were just 12 confirmed cases in the United States on February 11, 2020; now, a little over one year later, there are more than 32.4 million confirmed cases and more than 577,000 deaths.[1] Globally, the number of confirmed cases has risen to over 152 million, with over 3.1 million related deaths.[2] In New Mexico, there are now over 198,000 confirmed cases and 4,069 related deaths.[3] While the vaccine rollout is promising, it remains to be seen what the recent

---

[1]   *Previous U.S. COVID-19 Case Data*, Ctr. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/previouscases.html (last visited Aug. 9, 2020); *Cases in the U.S.*, Ctr. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 3, 2021).

[2]   *WHO Coronavirus Disease (COVID-19) Dashboard*, World Health Organization, https://covid19.who.int/ (last visited May 3, 2021).

[3] *2019 Novel Coronavirus Disease (COVID-19)*, N.M. Dep't of Health, https://cv.nmhealth.org/ (last visited May 3, 2021).

discovery of more contagious, and possibly more deadly, variants will have on the course of the pandemic in New Mexico.[4]

COVID-19's rapid spread is attributable to certain characteristics of the virus that causes it and the ease with which that virus is transmitted. COVID-19 is a respiratory illness that causes severe complications in some patients, including pneumonia in both lungs, organ failure, and death. Like most respiratory illnesses, COVID-19 spreads easily through close person-to-person contact, and the risk of transmission increases if individuals interact with more people, come within six feet of one another, and spend longer periods of time together.[5] Although it has not yet been measured precisely, a significant portion of COVID-19 cases result in mild symptoms or no symptoms.[6] Additionally, even in cases that are symptomatic, the average time from exposure to symptom onset is five to six days, with symptoms sometimes not appearing until as long as thirteen days after infection.[7] This means that individuals who have been infected and have the potential

---

[4] *New Variants of the Virus that Causes COVID-19*, Ctr. for Disease Control and Prevention (Feb. 2, 2021), https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html; *Second case of B117 COVID-19 variant identified in New Mexico*, KRQE (Jan. 18, 2021), https://www.krqe.com/health/coronavirus-new-mexico/second-case-of-b117-covid-19-variant-identified-in-new-mexico/.

[5] *How COVID-19 Spreads*, Ctr. for Disease Control and Prevention (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html; *Deciding to Go Out*, Ctr. for Disease Control and Prevention (Sept. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/deciding-to-go-out.html#:~:text=COVID%2D19%20spreads%20easier%20between,People%20are%20wearing%20masks.

[6] Nathan W. Furukawa et al., *Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic*, Emerging Infections Diseases, Vol. 26, Num. 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article.

[7] *COVID-19 Basics: Symptoms, Spread and Other Essential Information About the New Coronavirus and COVID-19*, Harvard Medical School (March 2020), https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics.

to infect others usually do not know they are infected for at least several days (and may never know, if they remain asymptomatic).

The ease and rapidity with which COVID-19 spreads and its severe and sometimes fatal symptoms in a certain percentage of the population create a potential for mass deaths and a severely overloaded health care system. Because many individuals who have COVID-19 do not know they have been infected, the only effective way to combat the spread of COVID-19 and to mitigate its impacts is to limit person-to-person contact and large gatherings to the greatest extent possible. Although social distancing guidelines generally advise people to stay six or more feet apart, even that degree of distancing does not guarantee that an individual will not contract COVID-19. This means that every foray by a person into a public space with other people carries some risk of transmission, particularly in indoor environments. For instance, a recent study has shown that the act of speaking can emit thousands of potentially infectious droplets which can linger in an enclosed space for between 8 and 14 minutes and greatly increase the risk of transmission within that space. *Id.*

## II.    New Mexico's public health emergency orders

Recognizing the seriousness of this virus and its ability to spread exponentially through close contacts and public spaces, the Governor declared a public health emergency under the Public Health Emergency Response Act, NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015), and invoked the All Hazards Emergency Management Act, NMSA 1978, §§ 12-10-1 to -10 (1959, as amended through 2007), by directing all cabinets, departments, and agencies to comply with the directives of the declaration and the further instructions of the Department of

Health.[8] Consistent with the powers provided during an emergency under the Public Health Emergency Response Act and the All Hazards Emergency Management Act, as well as the Public Health Act, NMSA 1978, §§ 24-1-1 to -40 (1973, as amended through 2019), the Secretary subsequently entered a series of public health orders ("PHOs") encouraging New Mexicans to stay in their homes to the greatest extent possible and to practice all possible precautions when they are required to enter public spaces.[9] In addition, the PHOs limit most public and private gatherings of any significant size and curtail the operations of many businesses. *Id.*

The restrictions imposed by the PHOs on businesses have undergone changes over the past year in response to case incidence, transmission rates, and what the scientific community has learned about COVID-19's transmission. The PHOs issued at the beginning of the pandemic generally required all but "essential" businesses and non-profits such as hospitals, banks, grocery stores, to cease in-person operations. *See id.* Beginning in May, most businesses and non-profits were allowed to reopen at various capacities.[10] These capacities vary depending on whether the nature of the business activity presents an increased risk of transmitting the virus. For instance, "close-contact businesses" such as barbershops and tattoo parlors, bars, and "food and drink establishments" have been subject to stricter capacity limits than most other businesses.[11]

---

[8] Governor Michelle Lujan Grisham, *Executive Order 2020-004* (March 11, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/03/Executive-Order-2020-004-r.pdf.

[9] *See generally Public Health Orders and Executive Orders*, N.M. Dep't of Health, https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (last visited Apr. 28, 2021) (collecting PHOs and executive orders relating to COVID-19).

[10] *See, e.g.*, N.M. Dep't of Health, *Public Health Order*, (May 15, 2021), https://cv.nmhealth.org/wp-content/uploads/2020/05/5-15-2020-PHO.pdf.

[11] *See, e.g.*, N.M. Dep't of Health, *Public Health Order*, at 3-7 (Sept. 18, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/09/091820-PHO.pdf.

Following a brief "reset" period in November 2020 in which all non-essential businesses were again ordered to cease most in-person operations,[12] the PHOs began allowing non-essential businesses and non-profits to operate at various capacities depending on the prevalence of the virus in their respective counties, as measured by the average number of new cases each day, weekly test positivity rates, and (as of April 28, 2021) vaccination rates.[13] In general, counties are assigned to the least restrictive level (Turquoise) if they have (1) a new COVID-19 case incidence rate less than 10 cases per 100,000 inhabitants, (2) an average percent of positive COVID-19 test results less than 7.5% over the most recent 14-day period, and (3) a certain percentage of their vaccine-eligible population fully-vaccinated; the next least restrictive level (Green) if they meet two of those criteria; the next level (Yellow) if they meet one; and the most restrictive level (Red) if they fail to meet any. *See id.*

As relevant to this case, the current PHO (as have previous ones) allows most non-essential businesses and non-profits—including essential "retail spaces" like grocery stores, retail banks, and pharmacies—to operate up to 25% of maximum capacity (both indoor and outdoor) in Red counties, 33% of maximum capacity in Yellow counties, 50% of maximum capacity in Green counties, and 75% of maximum indoor capacity and 100% of outdoor capacity in Turquoise counties. *Id.* at 7-12. The PHO continues to impose additional restrictions and capacity limits for other businesses and non-profits posing heightened risks of transmission. "Food and drink establishments," which include "restaurants, breweries, wineries, distillers, cafes, coffee shops, or

---

[12] *See, e.g.*, N.M. Dep't of Health, *Public Health Order* (Nov. 18, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/11/111820-PHO.pdf.

[13] N.M. Dep't of Health, *Public Health Order* at 6-7 (Apr. 28, 2021), https://cv.nmhealth.org/wp-content/uploads/2021/04/NCOV-PHO-Amendment-20210428.pdf [hereinafter April 28 Order].

other similar establishments that offer food or drink"[14] must abide by strict requirements and may only operate up to 25% of maximum capacity for outdoor spaces in Red counties; 33%/75% of maximum capacity for indoor spaces and outdoor spaces, respectively, in Yellow counties; 50%/75% of maximum capacity for indoor spaces and outdoor spaces, respectively, in Green counties; and 75% of maximum capacity for both indoor and outdoor spaces in Turquoise counties. *Id.* Similarly, "bars and clubs"—which are defined as "any business, other than those specifically defined as a 'food and drink establishment,' that typically or actually generates more than half of its revenue from the sale of alcohol for on-premises consumption, as well as adult entertainment venues, nightclubs, and dance clubs, regardless of the source of their revenue"—may only operate as such up to 25% of maximum capacity for outdoor spaces in Green counties and 33%/75% of maximum capacity for indoor spaces and outdoor spaces, respectively, in Turquoise counties. *Id.* at 3, 7-12. Beginning April 30, 2021, the vast majority of counties are in Green or Turquoise.[15]

### III.    Plaintiffs' claims in this case

Against this factual backdrop, Plaintiffs filed the instant § 1983 action. Plaintiffs, the New Mexico Elks Association, the Fraternal Order of Eagles, and the Loyal Order of the Moose International, are three fraternal organizations that operate "lodges" or "aeries" throughout the state. Compl. at ¶¶ 1-3, 11-13. Plaintiffs allege (inaccurately, as explained below) that Defendants, through the PHO, have required their organizations to remain closed throughout the pandemic. *Id.*

---

[14] The PHO specifically defines "breweries" as "businesses licensed pursuant to NMSA 1978, Section 60-6A-26.1," "distillers" as "businesses licensed pursuant to NMSA 1978, Section 60-6A-1," and "wineries" as "businesses licensed pursuant to NMSA 1978, Section 60-A-11."

[15] Press Release, *Updated Red-Yellow-Green-Turquoise criteria now in effect, statewide COVID-19 map updated*, Office of Governor Michelle Lujan Grisham (Apr. 30, 2021), https://www.governor.state.nm.us/2021/04/30/updated-red-yellow-green-turquoise-criteria-now-in-effect-statewide-covid-19-map-updated/ [hereinafter Reopening Announcement]

at ¶¶ 17-18, 24. Plaintiffs generally allege that this ostensible total prohibition on Plaintiffs' operations violates their rights to substantive and procedural due process, equal protection, and assembly. *Id.* at 5-8. In their prayer for relief, Plaintiffs request a declaratory judgment that the PHOs are unconstitutional and further request a temporary restraining order (TRO) and a preliminary and permanent injunction "prohibit[ing] Defendants from enforcing the public health orders in the arbitrary and capricious manner and fashion engaged by Defendants that keeps organizations like Plaintiffs closed and unable to even open under similar conditions and restrictions as other organizations." *Id.* at 8-9. Plaintiffs also seek compensatory and punitive damages for their alleged injuries. *Id.* at 9.

## IV.    Plaintiffs have been (and currently are) permitted to assemble and fundraise

To accurately gauge the legal issues posed by Plaintiffs' claims, it is necessary for this Court to understand the applicable restrictions to which Plaintiffs are subject. It is unclear from the Complaint exactly what PHO category Plaintiffs believe their non-profits fall under or exactly which businesses they believe are being treated more favorably and how.[16] Given Plaintiffs' allegations that their "organizations have been required to remain closed," Compl. at ¶¶ 17-18, 24, Defendants assume Plaintiffs' believe their organizations fall under the "bars and clubs" category because they "typically or actually generate[] more than half of [their] revenue from the sale of alcohol for on-premises consumption[.]" April 28 Order, *supra* note 13 at 3. Even if true, however, Plaintiffs' organizations have not "been required to remain closed." To the contrary, the State has previously communicated to all non-profit organizations that hold "club" liquor licenses, *see*

---

[16] At one point, Plaintiffs refer to themselves as "recreational facilities," Compl. ¶ 47, but Defendants have never considered fraternal organizations as such. Rather, this appears to be a typo resulting from Plaintiffs' counsel's copy-and-pasting of much of the Complaint from another he filed in *Hinkle Family Fun Center, LLC v. Lujan Grisham*, No. 1:20-cv-01025-MV-KK.

NMSA 1978, § 60-3A-3(E) (2019), that other operations of their organizations are permitted to operate under the PHOs' "catchall" category provisions, which allow operations in every county.[17] Defendants have also clarified this in the State's "Covid-Safe Practices" document, which contains additional requirements and guidelines for specific businesses and activities in addition to the PHOs' requirements.[18] Specifically, the Covid-Safe Practices applicable to "food and drink establishments" and "bars and clubs" provides:

> Non-profits licensed to serve food and/or alcohol are subject to these requirements, as well as the capacity restrictions provided in the state Public Health Order for restaurants and bars, only to the extent they provide food and/or alcohol service. Other activities unrelated to the service of food and/or alcohol organized by the non-profit may take place subject to other applicable Covid-Safe Practices and the state Public Health Order's capacity restrictions for the applicable category or the "catchall" category.

*Id.* at 13. Accordingly, Plaintiffs' members are allowed to assemble and fundraise at various capacities depending on the county's status; they are only prohibited from offering alcohol service in Yellow and Red counties. April 28 Order, *supra* note 13 at 7-12.

## DISCUSSION

**I.    Standard of review for a motion to dismiss under Rule 12(b)(6)**

The Court must dismiss a complaint under Rule 12(b)(6) if it fails "to state a claim upon which relief can be granted." When examining a complaint under Rule 12(b)(6), the Court must determine "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). In doing so,

---

[17] *See, e.g.*, Letter from Andrew Vallejos, Dir., Alcoholic Beverage Control, to Club Licensees (Mar. 4, 2021), http://rld.state.nm.us/uploads/files/Alcohol%20and%20Gaming/Letter%20to%20 Clubs%20reopening.pdf.

[18] Dep't of Health, *All Together New Mexico: COVID-Safe Practices for Individuals and Employers* (Apr. 26, 2021), https://indd.adobe.com/view/3f732e94-0164-424d-9ac6-a0ace27e70c8.

the Court should "consider the complaint as a whole, along with the documents incorporated by reference into the complaint." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1146 (10th Cir. 2015). Moreover, if "a complaint does not reference or attach a document, but the complaint refers to the document, and the document is central to the plaintiff's claim, the defendant may submit an "indisputably authentic copy to the court to be considered on a motion to dismiss.'" *Harjo v. City of Albuquerque*, 307 F. Supp. 3d 1163, 1185 (D.N.M. 2018) (Browning, J.) (quoting *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997)). The Court may also properly consider facts of which it may take judicial notice, such as its own files and records and those facts which are a matter of public record, such as government publications. *Id.* at 1185.

The United States Supreme Court has clarified that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and citation omitted). Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Mocek v. City of Albuquerque*, 813 F.3d 912, 921 (10th Cir. 2015) (stating that in reviewing a 12(b)(6) motion, courts should "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable"). Rather, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 555 (2007). "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and

common sense" to decide whether any well-pleaded facts have shown any entitlement to relief by "permit[ting] the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

## II.     Plaintiffs fail to state a plausible claim for which relief may be granted

### A.     Plaintiffs are not entitled to any of the injunctive relief they seek because they failed to sue Defendants in their official capacities

As an initial matter, it should be noted Plaintiffs have only sued Defendants in their *individual* capacities. *See* Compl. at 1 (stating that Defendants are being sued "Individually, Acting Under the Color of Law").[19] Yet Plaintiffs seek injunctive relief that Defendants could only grant in their *official* capacities. *See* Compl. at 8-9; *cf. Kuck v. Danaher*, 822 F. Supp. 2d 109, 148 (D. Conn. 2011) ("Plaintiffs have failed to name a proper defendant who would be able to provide prospective injunctive relief in connection with the appeals backlog since Plaintiffs cannot obtain prospective injunctive relief from individual capacity defendants. Plaintiffs could only obtain prospective injunction relief if they sued an official capacity defendant who could meet the requirements under *Ex-parte Young*."). Plaintiffs must therefore amend their Complaint to sue Defendants in their official capacities should they wish for the Court to even consider the merits of their request for injunctive relief. *See Smith v. Plati*, 56 F.Supp.2d 1195, 1203 (D.Colo.1999) (dismissing claims against state official in his individual capacity because the relief plaintiff requested could only be obtained against the defendant in his official capacity).

### B.     The PHO's restrictions as applied to Plaintiffs' do not violate equal protection or substantive due process because the restrictions do not discriminate against

---

[19] Plaintiffs' counsel has previously used this phrase to indicate he is suing an official solely in his individual capacity. *See e.g.*, *De Gutierrez v. Albuquerque Pub. Sch.*, No. 18 CV 00077 JAP/KBM, 2018 U.S. Dist. LEXIS 129717, at *1 (D.N.M. July 31, 2018) (suing some officials "individually acting under color of law" and another "individually and in his official capacity").

a suspect class, do not infringe on a fundamental right, and are rationally related to a *compelling* government interest

1.      The PHO's capacity restrictions and limitations on alcohol service are subject to rational basis review

Although the Equal Protection and Due Process clauses protect distinctly different interests, "their substantive analyses converge." *Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004). For substantive due process claims challenging legislative-type actions, such as the PHO, the Court typically applies a two-part test in which it first asks whether the action implicates a fundamental right.[20] *See Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009). If so, the Court applies strict scrutiny; if not, the Court applies rational basis review. *Id.* Similarly, in considering equal protection claims, the Court will apply rational basis review unless the

---

[20] This fundamental-rights analysis, as opposed to the "shocks-the-conscience" analysis, is applicable in this case, as the PHO is a quasi-legislative action which is generally applicable to all of New Mexico and it is the Department of Health's attempt to "through policy, to achieve a stated government purpose." *Abdi v. Wray*, 942 F.3d 1019, 1027-28 (10th Cir. 2019); *cf. Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 n.1 (3d Cir. 2000) ("[E]xecutive acts, such as employment decisions, typically apply to one person or to a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society." (internal quotation marks and citation omitted)). But Even if the latter standard applied, Plaintiffs' claim would still fail. "Conduct that shocks the judicial conscience is deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice." *Woodard*, 912 F.3d at 1300 (internal quotation marks omitted). "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employed it as an instrument of oppression." *Id.* Issuing public health orders closing or restricting certain high-risk businesses to stop the spread of a deadly virus can hardly be considered conscious-shocking. *See World Gym, Inc. v. Baker*, Civil Action No. 20-cv-11162-DJC, 2020 U.S. Dist. LEXIS 131236, at *12 (D. Mass. July 24, 2020) ("In light of the toll of the pandemic, [the plaintiffs' argument that the governor's COVID-19-related orders shock the conscious] is unconvincing. The state has a strong interest in stopping the spread of COVID-19, and accordingly, it cannot be said that the Governor's conduct amounts conscience-shocking action."). As one court bluntly observed, "the notion that restrictions designed to save human lives are 'conscious shocking' [is] absurd and not worthy of serious discussion." *Herrin v. Reeves*, No. 3:20cv263-MPM-RP, 2020 U.S. Dist. LEXIS 176604, at *23 (N.D. Miss. Sep. 25, 2020).

classification at issue discriminates against a suspect class. *See Curley v. Perry*, 246 F.3d 1278, 1285 (10th Cir. 2001).

With regard to Plaintiffs' equal protection claims, such fails because they do not allege that Defendants intentionally discriminated against fraternal organizations in the PHO. *See generally* Compl. The PHO is facially neutral since it requires other businesses other than fraternal organizations to remain closed. *Cf. ETP Rio Rancho Park*, 2021 U.S. Dist. LEXIS 23409, at **138-39 (citing *Romer v. Evans*, 517 U.S. 620, 632 (1996)); *see generally* April 28 Order, *supra*, note 13. Therefore, Plaintiffs must make out a prima facie case of discriminatory animus toward fraternal organizations. *Id.* (citing *Washington v. Davis*, 426 U.S. 229, 241 (1976)). Discriminatory intent "requires that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of the law's differential treatment of a particular class of persons." *SECSYS, Ltd. Liab. Co. v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012) (internal quotation marks and citation omitted). As the Complaint contains no allegations that the PHO's restrictions are born out of animus toward fraternal organizations, the restrictions do not "run afoul of the Constitution." *Id.*; Compl. at 24-25. But even if Plaintiffs did make such an allegation, Plaintiffs do not allege (as they cannot) that they are members of a suspect class which would give rise to any sort of heightened scrutiny. *See Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002) (stating governmental classifications are only subject to strict scrutiny if they target a suspect class such as race or national origin and intermediate scrutiny is applied to quasi-suspect classes like gender).

Plaintiffs' substantive due process claim similarly only implicates (at most) rational basis. In asserting a substantive due process claim, Plaintiffs bear the burden of providing a "careful description of the asserted fundamental liberty interest" and demonstrating how such a right is

"objectively deeply rooted in [the] Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotation marks and citations omitted). Plaintiffs' vague, conclusory, and generalized assertions of their fundamental right "to pursue lawful employment" or "be free from governmental interference" do not meet this requirement. Compl. at 5-6; *see ETP Rio Rancho Park*, 2021 U.S. Dist. LEXIS 36354, at *119.

Moreover, courts have already rejected Plaintiffs' alleged rights "to pursue lawful employment" or "be free from governmental interference" as fundamental rights warranting strict scrutiny.  It is well established that "[t]he right to 'make a living' is not a 'fundamental right,' for either equal protection or substantive due process purposes." *Medeiros v. Vincent*, 431 F.3d 25, 32 (1st Cir. 2005); *see Guttman v. Khalsa*, 669 F.3d 1101, 1118 (10th Cir. 2012) (holding that a right to practice in one's chosen profession is not fundamental). Additionally, the "Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned." *Nebbia v. New York*, 291 U.S. 502, 527-528 (1934).

Following this principle, Judge Browning recently ruled that trampoline parks' alleged right to run a business free from State interference was not a fundamental right. *ETP Rio Rancho Park*, 2021 U.S. Dist. LEXIS 36354, at *117-18.[21] Other federal courts have similarly rejected substantive due process challenges to COVID-19 restrictions on the basis that there is no fundamental right to operate a business. For example, in *Xponential Fitness v. Arizona*, the

---

[21] Furthermore, in New Mexico a liquor license is not a property right; it is a privilege which is subject to regulations. *Chronis v. State*, 1983-NMSC-081, ¶¶ 9-10, 100 N.M. 342, 670 P.2d 953 ("This Court has repeatedly held that a liquor license is a privilege subject to regulation and not a property right.").

plaintiffs asserted that an executive order closing their businesses violated their due process rights. 2020 U.S. Dist. LEXIS 123379 at *16 (D. Ariz. July 14, 2020). The court disagreed that the order implicated any due process concerns because the "right to do business has not been recognized as a constitutionally-protected property right." *Id.* In *Talleywhacker, Inc. v. Cooper*, the court applied the same legal reasoning in rejecting the due process claims of owners of entertainment venues in North Carolina who challenged orders closing their business due to COVID-19. 465 F. Supp. 3d 523, 541-42 (E.D.N.C. June 8, 2020). Numerous other courts have followed suit. *See, e.g.*, *In SH3 Health Consulting, LLC v. Page*, No. 4:20-cv-00605 SRC, 2020 U.S. Dist. LEXIS 81433, at *28 (E.D. Mo. May 8, 2020); *910 E Main LLC v. Edwards*, No. 6:20-CV-00965, 2020 U.S. Dist. LEXIS 152366, at *22 (W.D. La. Aug. 21, 2020); *Paradise Concepts, Inc. v. Wolf*, No. 20-2161, 2020 U.S. Dist. LEXIS 157250, at *9 (E.D. Pa. Aug. 31, 2020). Most recently, in *Kelley O'Neil's Inc. v. Ige*, 2021 U.S. Dist. LEXIS 36260, *20-25 (D. Haw. February 26, 2021), the court refused to enjoin an executive order requiring the closure of bars and nightclubs to slow the spread of COVID-19 in Hawaii.

Finally, as discussed below, the PHO does not impermissibly infringe on Plaintiffs' freedom of association. *See* discussion, *infra*, Section II(D). Thus, the Court must use rational basis review when reviewing Plaintiffs' challenges to the PHO's capacity restrictions and limitations on Plaintiffs' ability to serve alcohol.

### 2. The PHO's restrictions on "bars and clubs" is rationally related to a compelling government interest in combatting the spread of COVID-19

Over one hundred years ago, the Supreme Court declared, "[A] community has the right to protect itself against an epidemic of disease which threatens its members," and judicial scrutiny should be limited to laws that have "no real or substantial relation to" that purpose. *Jacobson v.*

*Massachusetts*, 197 U.S. 11, 31 (1905). This principle stands no less true today. Navigating the once-in-a-lifetime health crisis arising from the COVID-19 pandemic necessarily requires difficult choices, but these tough decisions must be made in order to protect the health and safety of the public. In *South Bay United Pentecostal Church v. Newsom*, a majority of the justices declined to enjoin a California executive order limiting attendance at religious institutions in light of COVID-19. 140 S. Ct. 1613 (2020). Relying on *Jacobson*, Chief Justice Roberts observed, "The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" 140 S. Ct. at 1613 (Roberts, C.J., concurring) (quoting *Jacobson*, 197 U.S. at 38). "When those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad[,]'" he continued, "Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.* (quoting *Marshall v. United States*, 414 U. S. 417, 427 (1974) and *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 545 (1985)).

Indeed, relying on the more recent COVID-19-related Supreme Court case, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 208 L. Ed. 2d 206, 207 (U.S. 2020), this Court just recently concluded that "*Jacobson* . . . provides the Court with guidance how to apply tiered scrutiny in the public health emergency context[,]" and therefore,

> if there has been no "plain, palpable invasion of rights secured by the fundamental law"—such as discrimination based on a suspect class or violation of a fundamental right under the Constitution—the Court will evaluate whether the law or policy in question has a "real or substantial relation" to the State's public health objectives— in other words, whether the State has a rational basis for the challenged policy.

*Hernandez*, 2020 U.S. Dist. LEXIS 238477, at *155-56 (quoting *Jacobson*, 197 U.S. at 31).

To survive rational basis review, "the [law] need only be rationally related to a legitimate government purpose." *See Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002). In challenging a governmental action for want of a rational basis, "the burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the [law]." *Bd. of Trs. v. Garrett*, 531 U.S. 356, 367 (2001) (internal quotation marks and citation omitted). "Th[e] standard is objective—if there is a reasonable justification for the challenged action, [the court] do[es] not inquire into the government actor's actual motivations." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011). "[R]ational-basis review does not give courts the option to speculate as to whether some other scheme could have better regulated the evils in question." *Powers v. Harris*, 379 F.3d 1208, 1217 (10th Cir. 2004). Courts "will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish or because the statute's classifications lack razor-sharp precision. *Id.* (citations omitted). "Nor can [a court] overturn a statute on the basis that no empirical evidence supports the assumptions underlying the legislative choice." *Id.*; *see also League of Indep. Fitness Facilities & Trainers*, 814 Fed. Appx. 125, 128 (6th Cir. 2020) ("Under [rational basis review], the Governor's action [closing businesses in light of COVID-19 pandemic] 'is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" (quoting *FCC v. Beach Commc'ns*, 508 U.S. 307, 315 (1993)). Indeed, rational basis scrutiny is so deferential that courts "must independently consider whether there is any conceivable rational basis for the classification, regardless of whether the reason ultimately relied on is provided by the parties." *Teigen v. Renfrow*, 511 F.3d 1072, 1084 (10th Cir. 2007) (alterations, internal quotation marks, and citation omitted).

As an initial matter, it is undisputed that Defendants have a rational, indeed *compelling*, interest in stemming the spread of COVID-19. *See Roman Catholic Diocese*, 141 S. Ct. at 67. Plaintiffs contend that Defendants' limitations regarding their operation have "no basis in science and is arbitrary and capricious," however, these allegations are threadbare at best. *See* Compl. at 4. But as Judge Browning recently observed, "The more closely a person interacts with others and the longer that interaction, the higher the risk of COVID-19 spread." *ETP Rio Rancho Park*, 2021 U.S. Dist. LEXIS 23409 at *110 (internal quotation marks and citation omitted). Given this, it is reasonable that the State would seek to restrict the operation of locations where members of the public are likely to come within close proximity to one another.

This is especially necessary in bars and clubs because people cannot simultaneously drink and wear a mask. Further, a bar presents a greater risk of COVID-19 transmission than other businesses like restaurants because it is an enclosed space where people socialize without masks due to consuming alcohol for an extended period of time, whereas restaurant patrons typically conduct the limited activity of eating a meal.[22] Additionally, bars and clubs patrons are, by definition, more likely to drink alcohol. Bars and clubs also present an increased risk for COVID-19 because people from different households interact and mingle in bars whereas in a restaurant-

---

[22] *See e.g.*, Niamh Fitzgerald et al., *Managing COVID-19 Transmission Risks in Bars: An Interview and Observation Study*, J. of Studies on Alcohol and Drugs (2021), https://www.jsad.com/doi/pdf/10.15288/jsad.2021.82.42; Caitlin Rivers, et al., *Public Health Principles for a Phased Reopening During COVID-19: Guidance for Governors*, John Hopkins Bloomberg School of Public Health (Apr. 17, 2020), https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2020/200417-reopening-guidance-governors.pdf (concluding that nonessential businesses like bar have high contact intensity and a high number of contacts); Stephanie Soucheray, *More evidence points to bars adding to COVID-19 spread*, Center for Infectious Disease Research and Policy (Sept. 15, 2020), https://www.cidrap.umn.edu/news-perspective/2020/09/more-evidence-points-bars-adding-covid-19-spread; *Why Bars Continue to Be High-Risk Environments for COVID-19*, Healthline, https://www.healthline.com/health-news/why-bars-continue-to-be-high-risk-environments-for-covid-19 (last visited Apr. 28, 2021).

goers typically stay with their group at reserved tables. *See id.* Further, the consumption of alcohol is likely to lower patrons' inhibitions and decrease likelihood of following COVID-19 protocols. *See id.*

Courts across the country have ruled that orders limiting the operations of bars for similar reasons met the standard for rational basis review. *See, e.g.*, *Kelley O'Neil's Inc.*, 2021 U.S. Dist. LEXIS 36260; *Ricky Dean's v. Marcellino*, 2020 U.S. Dist. LEXIS 216635, *2 (D. Kan. November 19, 2020) (upholding orders limiting business hours of restaurants and bars with liquor licenses). The Fifth Circuit recently upheld two district court orders denying injunctive relief regarding Louisiana's Bar Closure Order which prohibited certain liquor licensees from operating. *See Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456 (5th Cir. 2021). The court reasoned that even "if the Bar Closure Order's classifications are based solely on the premise that venues whose primary purpose and revenue are driven by alcohol sales rather than food sales are more likely to increase the spread of COVID-19, such a rationale . . . is sufficiently 'plausible' and not 'irrational.'" *Id.* at 470. The PHO's restrictions for "bars and clubs" are even more tailored than the restrictions in *Big Tyme*, allowing these locations to serve alcohol depending on the virus' prevalence in each county. *See* April 28 Order at 6-13. Indeed, the vast majority of bars have able to open at some capacity since April 30, 2021. *See* Reopening Announcement, *supra* note 15.

To the extent Plaintiffs complain about the PHO's distinction between essential businesses and non-essential businesses, *see* Compl. at ¶ 23, such a distinction represents Defendants' judgment—based on science and plain common sense—that some activities are necessary to run society during a pandemic. The services provided at hospitals, daycares, funeral homes, homeless shelters, grocery stores, banks, and pharmacies are vital for New Mexicans to survive this once-in-a-lifetime pandemic. *See Legacy Church, Inc. v. Kunkel*, 455 F. Supp. 3d 1100, 1159-60

(D.N.M. 2020) (discussing how the services and goods provided by essential businesses under the PHO are necessary). Plaintiffs' ability to serve alcohol is simply not critical for everyday life or to prevail against the pandemic. Nor have Plaintiffs even attempted to demonstrate that any essential business is a proper comparator for an equal protection claim. *Cf. Moxie Owl, Inc. v. Cuomo*, No. 1:21-cv-194 (MAD/DJS), 2021 U.S. Dist. LEXIS 75138, at *8 (N.D.N.Y. Mar. 18, 2021). Despite this, Plaintiffs' organizations are subject to the same capacity restrictions as essential "retail spaces" for other activities. *See* April 28 Order at 6-13. Contrary to Plaintiffs' allegations, their occupancy limits are greater than or the same as restaurants, golf courses, gyms, and country clubs. *See id.* The only difference is that Plaintiffs' bar area is subject to the same restrictions as all "bars and clubs" because these locations pose a heighten risk for the transmission of the virus.

Ultimately, while Plaintiffs' may complain that the PHOs' restrictions are underinclusive or ill-tailored because they do not also close restaurants or other businesses, this is no reason for this Court to invalidate them. *See Legacy Church, Inc.*, 455 F. Supp. 3d at 1154 n.12 (Browning, J.) ("The government need not choose between doing nothing in the face of a pandemic and closing all of society."); *Xponential Fitness*, 2020 U.S. Dist. LEXIS 123379, at *23 ("Plaintiffs' frustrations that the June 29, 2020 Executive Order does not close every business in which the virus might easily spread is also understandable; however, the Order need not be the most effective or least restrictive measure possible to attempt to stem the spread of COVID-19 to be rational."); *Talleywhacker*, 465 F. Supp. 3d 523 (holding that the North Carolina governor's executive order requiring entertainment and fitness facilities to remain closed, but allowing restaurants, breweries, wineries, distilleries, personal care businesses, grooming businesses , and tattoo parlors to open survived rational basis review despite similarities between closed and open businesses). Accordingly, Plaintiffs' equal protection and substantive due process claims fail as a matter of law.

C.   **Defendants did not violate Plaintiffs' procedural due process rights because they did not deprive Plaintiffs of a protected interest and the PHO is a quasi-legislative action**

Plaintiffs next claim Defendants violated Plaintiffs' right to procedural due process under the Fourteenth Amendment. *See* Compl. at 6. To prevail, "[Plaintiffs] must show (1) the state deprived him of a protected interest in liberty or property and (2) he was not afforded an appropriate level of process[.]" *Leek v. Miller*, 698 Fed. Appx. 922, 927 (10th Cir. 2017) (internal quotation marks and citation omitted). Again, Plaintiffs fail to show, even prima facie, that they have been deprived of a protected interest. Further, Plaintiffs cannot demonstrate that they are entitled to process in response to the challenged legislative action.

As a threshold matter, Plaintiffs cannot establish that the PHOs deprived them of a protected interest in liberty or property. Plaintiffs fail to identify with any specificity the protected liberty interest at issue. *See* Compl. at 6. To the extent Plaintiffs are reiterating their claims that they have been deprived of a right to make a living or run a non-profit free from regulation, that issue has been addressed above. *See* discussion, *supra* Section II(C)(1)(a)(ii)); *see also Kerry v. Din*, 576 U.S. 86, 99 (2015) (rejecting the dissent's position that "the term 'liberty' in the Due Process Clause includes implied rights that, although not so fundamental as to deserve substantive-due-process protection, are important enough to deserve procedural-due-process protection"). Further, the Supreme Court has ruled that the "activity of doing business, or the activity of making a profit is not property in the ordinary sense" and is therefore not a protected interest for purposes of procedural due process claims. *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999); *see also Balt. Air Transp., Inc. v. Jackson*, 419 Fed. Appx. 932, 937 (11th Cir. 2011) (holding that "no constitutional right is implicated by a complaint that asserts a property interest in maintaining a business or earning a profit" (citing *College Sav. Bank*, 527

U.S. at 676)). It follows that the activity of running a *non-profit* is similarly lacking as a protected interest. Lastly, to the extent Plaintiffs claim they have been deprived of their right to assemble, such a claim lacks merit, as discussed below. *See* discussion, *infra* Section II(C)(3).

Yet even assuming, *arguendo*, Plaintiffs could establish a protected liberty or property interest under the first inquiry, a procedural due process violation will not lie when the underlying governmental action affects a general class of persons. *See Okla. Educ. Ass'n v. Alcoholic Beverage Laws Enf't Comm'n*, 889 F.2d 929, 936 (10th Cir. 1989) ("When the legislature passes a law which affects a general class of persons, those persons have all received procedural due process—the legislative process."); *see also 75 Acres, LLC v. Miami-Dade Cty.*, 338 F.3d 1288, 1294 (11th Cir. 2003) ("[I]f government action is viewed as legislative in nature, property owners generally are not entitled to procedural due process."); *Richardson v. Town of Eastover*, 922 F.2d 1152, 1158 (4th Cir. 1991) ("[I]f a town's action is legislative, an affected party has no right to notice and an opportunity to be heard.").

Although this exception typically applies to laws passed by Congress or state legislatures, courts have applied this exception based only on whether the action applies to a larger segment of the population rather than a limited number of individuals. *See, e.g.*, *Curlott v. Campbell*, 598 F.2d 1175, 1181 (9th Cir. 1979) ("At the outset we doubt very much that procedural due process prior to reduction of benefits is required when an agency makes a broadly applicable, legislative-type decision." (citing *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441 (1915)). Following this principle, courts have held that executive orders issued in response to the current pandemic were legislative in nature, and therefore, did not implicate procedural due process. *See, e.g.*, *Carmichael v. Ige*, No. 20-00273 JAO-WRP, 2020 U.S. Dist. LEXIS 116860, at *29 (D. Haw. July 2, 2020) ("Moreover, because the Emergency Proclamations affect the entire State, they do

not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient." (internal quotation marks and citation omitted)); *cf. Hernandez*, No. CIV 20-0942 JB/GBW, at 154 (holding that the New Mexico Public Education Department's school reentry plan was "quasi-legislative" and therefore, the plaintiffs were likely not entitled to procedural due process). Indeed, both Judge Browning and Chief Judge Johnson have already held that the same PHOs' capacity restrictions are legislative in nature because they affect the entire state and apply to thousands of businesses and, therefore, not subject to any procedural due process claim because they affect a general population. *See ETP Rio Rancho*, 2021 U.S. Dist. LEXIS 36354, at \*\*149-51; *Peterson v. Kunkel*, 492 F. Supp. 3d 1183 2020 U.S. Dist. LEXIS 183471, \*25-26 (D.N.M. 2020). Respectfully, this Court should likewise hold that Plaintiffs are not entitled to procedural due process with regard to the issuance of the PHOs.

**D.    Plaintiffs' have no right to expressive association and, even if they did, the PHO does not impermissibly infringe upon such a right**

Finally, Plaintiffs claim the PHOs have unconstitutionally interfered with their right to assemble. *See* Compl. at 8. Both "the Supreme Court and the Tenth Circuit have conflated and rephrased associational and assembly rights as the 'freedom to expressive association.'" *Legacy Church, Inc.*, 472 F. Supp. 3d at 1051 (quoting *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 658 (10th Cir. 2006). Accordingly, the Tenth Circuit has treated claimed violations of freedom to associate and assemble as a single claim to be analyzed as a claim to freedom of expressive association. *Id.* at 1019. "Expressive association is the 'right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.'" *Id.* at 1020 (quoting *Schalk v. Gallemore*, 906 F.2d 491, 498 (10th Cir. 1990)). "Expressive association is not, however,

an absolute right, because 'there may be countervailing principles that prevail over the right of association.'" *Id.* (quoting *Grace United Methodist Church*, 451 F.3d at 658).

In evaluating Plaintiffs' expressive association claim, the initial inquiry is whether the group engages in expressive association. *See A.M. v. N.M. Dep't of Health*, 117 F. Supp. 3d 1220, 1258 (D.N.M. 2015). While "[t]he First Amendment's protections of expressive association is not reserved for advocacy groups," a group claiming protection "must engage in some form of expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). In other words, "[b]ecause 'there is no generalized right of free association,' courts only 'recognize[] a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.'" *Legacy Church, Inc.*, 472 F. Supp. 3d at 1054 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984)).

Here, Plaintiffs do not allege that they engage in any activities protected by the right to expressive association. *See generally* Compl. Indeed, courts have held that fraternal organizations like the Fraternal Order of Eagles have no right to assemble because they do not engage in activities protected by the First Amendment. For example, in *Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 244 (6th Cir. 1990), in rejecting the Eagles' freedom of association claim, the Sixth Circuit observed that "[t]he group is a private drinking club with some recreational activities that runs its cash bar and banquet hall as a quasi-business ventures" and "has no political purpose that would require First Amendment protection." Similarly, here, Plaintiffs do not allege they associate to take a position on any public issues or otherwise engage in protected activities but merely provide general mission statements focused on promoting fraternity and fellowship. *See* Compl. at ¶¶ 11-13. This is not enough. *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes . . . such a kernel is not

sufficient to bring the activity within the protection of the First Amendment."). Rather, Plaintiffs'

claims are more akin to "a generalized right of social association," which the Supreme Court has

held finds no protection under the First Amendment. *See id.* (ruling that dance hall patrons could

not establish they were entitled to First Amendment protection because, *inter alia*, there was no

suggestion "that [they] [took] positions on public questions"); *see also Schultz v. Wilson*, 304 Fed.

Appx. 116, 120 (3d Cir. 2008) ("A social group is not protected unless it engages in expressive

activity such as taking a stance on an issue of public, political, social, or cultural importance.")

(citing *Pi Lambda Phi Fraternity v. University of Pittsburgh*, 229 F.3d 435, 444 (3d Cir. 2000)).

And perhaps most importantly, Plaintiffs *can* assemble at any club location they wish. *See*

background, *supra* Section IV.

Assuming, *arguendo*, Plaintiffs have a protected expressive associational right, the next

step is to determine whether "[i]nfringements on that right [are] justified by regulations adopted

to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved

through means significantly less restrictive of associational freedoms." *Legacy Church, Inc.*, 472

F. Supp. 3d at 1022 (quoting *Roberts*, 468 U.S. at 623). Here, it is beyond dispute that "[s]temming

the spread of COVID-19 is unquestionably a compelling interest[.]" *Roman Catholic Diocese*, 141

S. Ct. at 67; *ETP Rio Rancho Park, LLC*, 2021 U.S. Dist. LEXIS 23409, at *149-50. Nor is there

any allegation that the PHO restrictions are not "unrelated to the suppression of ideas." *Legacy*

*Church, Inc.*, 472 F. Supp. 3d at 1022 (quoting *Roberts*, 468 U.S. at 623); *see generally* Compl.

The only question is whether stemming the spread of COVID-19 could "be achieved through

means significantly less restrictive of associational freedoms." *Id.* The answer is "no."

Any time people gather in person, they risk spreading the virus, falling ill, and worse.

Nonetheless, the PHO does not totally foreclose Plaintiffs' ability to assemble. To the contrary,

the PHO permits Plaintiffs to gather in any club in the State. *See* background, *supra* Section IV. True, a select few businesses essential to an orderly society (unlike Plaintiffs' clubs) may not have any hard-and-fast capacity limits, but this does not render the PHO unconstitutional. *See Legacy Church, Inc.*, 472 F. Supp. 3d at 1076-77 (rejecting a church's expressive association claim despite the fact that the PHO did not impose similar capacity limits on essential businesses). Rather, the operative fact is that, despite the continued risks of in-person gatherings, Defendants have tailored the PHO to permit Plaintiffs to gather. For example, even though Plaintiffs' clubs might technically fall under the definition of "bars and clubs" in the PHO because they "typically or actually generates more than half of [their] revenue from the sale of alcohol for on-premises consumption," April 28 Order, *supra* note 13 at 3, they have been granted the ability to operate non-alcohol related aspects of their organizations under the "catchall" category's capacity limits—which are identical to the limits imposed on essential "retail spaces" like grocery stores and pharmacies. *See* background, *supra* Section IV. The PHO also grants Plaintiffs' clubs greater capacity limits as the prevalence of the virus decreases in their respective counties. *See* April 28 Order, *supra* note 13. Thus, while a few clubs may have a more limited capacity, most clubs can operate up to 75% of maximum capacity for nearly everything besides alcohol service. *See id.*

In sum, even if Plaintiffs had a right to expressive association, the PHO does not impermissibly infringe upon that right. *See Amato v. Elicker*, No. 3:20cv464 (MPS), 2021 U.S. Dist. LEXIS 72507, at **2, 19-20 (D. Conn. Apr. 15, 2021) (dismissing freedom of assembly and association claims brought by restaurant owners against a public health order requiring restaurants serve food and beverages only for off premises consumption because the order did not ban assemblies but merely restricted them and left open ample alternative channels of communication

such as online, by telephone, and in small groups outside of the restaurants); *see also Legacy Church, Inc.*, 472 F. Supp. 3d at 1074-78.

  **E.**  **Plaintiffs' claims for damages are barred by sovereign and qualified immunity**

  Given Plaintiffs' failures to state any valid claim for relief, Plaintiffs' request damages necessarily fails as well. Yet even if Plaintiffs *did* assert a valid claim against Defendants, their request for damages are barred by qualified immunity.[23] "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citations omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. . . . Ordinarily . . . there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) (internal quotation marks and citations omitted). Plaintiffs cannot credibly claim that Defendants violated any clearly established rights when Defendants took action to protect New Mexicans in the midst of an unprecedented pandemic—actions which, as discussed above, courts have upheld repeatedly over the past year. Accordingly, Plaintiffs' claim for damages fails regardless of the merits underlying their claims.

**CONCLUSION**

  For the foregoing reasons, this Court should dismiss Plaintiffs' action with prejudice.

---

[23] Any claims against Defendants in their official capacities would likewise be barred by sovereign immunity. *See Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) ("[B]ecause an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity, the Eleventh Amendment provides immunity when [s]tate officials are sued for damages in their official capacity." (internal quotation marks and citation omitted)).

Respectfully submitted,

*s/ Holly Agajanian*
Holly Agajanian
*Chief General Counsel to*
*Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
Holly.Agajanian@state.nm.us
505-476-2210

Maria S. Dudley
*Associate General Counsel to*
*Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
maria.dudley@state.nm.us
505-476-2210

Kyle P. Duffy
*Associate General Counsel to*
*Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
kyle.duffy@state.nm.us
505-476-2210

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2021, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

Respectfully submitted,

*s/ Holly Agajanian*
Holly Agajanian