IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

THE NEW MEXICO ELKS ASSOCIATION,
FRATERNAL ORDER OF EAGLES, NEW MEXICO STATE AERIE,
NEW MEXICO LOYAL ORDER OF THE MOOSE,

        **Plaintiffs,**

                         **Civ. No. 21-354 KG/LF**

**v.**

MICHELLE LUJAN GRISHAM,
Individually, Acting Under the Color of Law,
and TRACIE C. COLLINS,
Individually, Acting Under the Color of Law,

        **Defendants.**

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

COMES NOW, Plaintiffs, through undersigned counsel of record Western Agriculture, Resource and Business Advocates, LLP (A. Blair Dunn, Esq. and Jared R. Vander Dussen, Esq.) and respectfully supplies this Court with their Response in opposition to the Defendant's Motion to Dismiss.

## <u>INTRODUCTION</u>

First and foremost, Plaintiffs do, in fact, allege, *see generally* Compl., that they engaged in expressive association activities, contrary to the plain mischaracterization of Defendants.  In fact, it is that intentional mischaracterization that is fatal to the Motion to Dismiss.  Despite pages of irrelevant circular arguments that avoid this critical point, Defendants must ultimately concede that the argument here boils down, for the purpose of this Motion, to whether or not Plaintiffs have *plausibly* alleged that they are non-profit organizations that are engaged in advocacy work on issues in their community and that the Public Heath Orders (PHO's) have interfered with that expressive association, warranting that this Court apply strict scrutiny to the review of those

actions. And then, even if this Court were to somehow find that Plaintiffs are not engaged in expressive association, that there is a rational basis for allowing the Albuquerque Country Club to serve food and alcohol to their patrons playing gin rummy in the Card Room; but that these fraternal orders with charitable purposes should be prohibited from serving food and alcohol to the public that wishes to play bingo or pool in their establishments. It is ridiculous to even assert that somehow the Corona Virus knows the difference between gin rummy and bingo for example.

Plaintiffs wish to be abundantly clear for the Court that Plaintiffs take no issue with the fact of the reality that there is a public health pandemic caused by this virus.  And that at the onset, when the gravity of the threat was unknown and information was scarce as to how to combat the spread of the virus, that COVID-19 presented an emergent crisis that justified to a certain extent drastic measures such that for a short time it was necessary to subordinated individual liberties and the people's livelihoods under the rubric of *Jacobson v. Massachusetts,* 197 U.S. 11, 31 (1905). COVID-19 is certainly a grave concern, just like smallpox was, and the exercise of infringement into personal liberty by the government of requiring a vaccine as considered in *Jacobson* stands on solid ground without a doubt. But it is a far cry between the succinct invasion of the person's body to require a vaccine and indefinitely suspending constitutionally protected liberties. Nowhere in the jurisprudence of this nation does the record reflect that even the threat of war and invasion of foreign enemies serve to legitimately justify the indefinite suspension of the right to engage in free exercise and assembly under the First Amendment. As the Supreme Court has observed: "[t]he Constitution was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the power of the States were determined in the light of emergency, and they are not altered by emergency." *Home Building & Loan Ass'n. v. Blaisdell*, 290 U.S. 398, 425, 54 S.Ct. 231, 78 L.Ed. 413 (1934).

Yet, a year and two months later, in New Mexico, that is the only solution that these Defendants can muster. They have failed to craft any resolution other than stealing constitutional liberty from these Plaintiffs and their fellow New Mexicans. The only solution that they wish for this Court to condone is to accept that because this is a serious problem, that Defendants have a blank check to take away the ability of these Plaintiffs and many other New Mexicans to earn a living in their chosen professions because the chosen profession of these Plaintiffs is that they are proprietors of fun and where fun might be had, as is necessary for the populace's emotional well-being, they speculate without evidence (after a year of data collection) that these organizations still pose a threat that requires the destruction of their liberty. It absolutely should shock the conscience of this Court that these Defendants can at this point, over a year later, believe that they can justify so arbitrarily depriving New Mexicans including these Plaintiffs of their constitutional protected liberty.

## ARGUMENT

I.     **A Liberty Interest is Implicated and the Defendant's Actions Violate Substantive Due Process and Procedural Due Process**

A.     **Defendants' Argument That This Court Should Apply the *Jacobson* Deferential Test from Almost a Year Ago is Wrong as to a Due Process or Equal Protection Analysis**

This Court examining the type of constitutional scrutiny that should be applied to challenges to COVID-19 mitigation strategies should consider the recent scholarly article, Lindsay F. Wiley & Stephen I. Vladeck, *Coronavirus, Civil liberties, and the Courts: the Case Against "Suspending" Judicial Review*, 133 Harv. L. Rev. F. 179 (2020). Directly applicable to this Court's review in the article, the learned professors argue that *Jacobson* should not be interpreted as permitting the "suspension" of traditional levels of constitutional scrutiny in reviewing challenges to COVID-19 mitigation measures. *Id.* at 182 ("In this Essay, we argue that

the suspension approach to judicial review is wrong—not just as applied to governmental actions

taken in response to novel coronavirus, but in general."). The professors highlight three objections

to an overly deferential "suspension" model standard of review:

> First, the suspension principle is inextricably linked with the idea that a crisis is of finite—and brief—duration. To that end, the principle is ill-suited for long-term and open-ended emergencies like the one in which we currently find ourselves.
>
> Second, and relatedly, the suspension model is based upon the oft-unsubstantiated assertion that "ordinary" judicial review will be too harsh on government actions in a crisis—and could therefore undermine the efficacy of the government's response. In contrast, as some of the coronavirus cases have already demonstrated, most of these measures would have met with the same fate under "ordinary" scrutiny, too. The principles of proportionality and balancing driving most modern constitutional standards permit greater incursions into civil liberties in times of greater communal need. That is the essence of the "liberty regulated by law" described by the Court in *Jacobson*.
>
> Finally, the most critical failure of the suspension model is that it does not account for the importance of an independent judiciary in a crisis—"as perhaps the only institution that is in any structural position to push back against potential overreaching by the local, state, or federal political branches .... Otherwise, we risk ending up with decisions like *Korematsu v. United States* [323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) ]—in which courts sustain gross violations of civil rights because they are either unwilling or unable to meaningfully look behind the government's purported claims of exigency.

*Id.* at 182-83 (internal footnotes and citations omitted).

Treating something as an emergent crisis when the emergency has been or should have

been abated with knowledge and preparation, as well as prohibiting some activities when

performed by the age bracket that is least likely to spread the disease does it for fun, but not when

it is done for non-fun exercise or on a larger overall space is definitionally irrational. Moreover,

allowing the government to ignore data to continue to justify suppression of liberty is inconsistent

with *Jacobson*. Frankly, Judge Browning decided to apply the emergency standard of rational

basis in *Legacy Church, Inc. v. Kunkel*, 2020 WL 3963764, (D.N.M. July 13, 2020) in July based

upon information from May and June, it is now obviously almost June of 2021 and the state has

4

been collecting data for over a year.  We are now well into the realm that the *Jacobson* Court cautioned of stating:

> Before closing this opinion we deem it appropriate, in order to prevent misapprehension [of] our views, to observe—perhaps to repeat a thought already sufficiently expressed, namely—that the police power of a state, whether exercised directly by the legislature, or by a local body acting under its authority, may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression.

*Id.* at 38, 25 S.Ct. 358. Here again, just as they did with *Legacy*, Defendants rely on a *Jacobson* based ruling reached in reliance of a lack of data and reached at the beginning of the pandemic to justify ignoring scientific data collected in New Mexico over a year after the pandemic started. In that case, *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, (Jul. 24, 2020), Justice Alito's dissent (joined by Justices Thomas and Kavanaugh) casts doubt on whether *Jacobson* can, consistent with modern jurisprudence, be applied to establish a diminished, overly deferential, level of constitutional review of emergency health measures that are imposed months into a public health concern with no end in sight. In arguing that the Supreme Court should have granted the requested injunction, Justice Alito stated: "[w]e have a duty to defend the Constitution, and even a public health emergency does not absolve us of that responsibility." *Id.* at 2604. Justice Alito pointed out:

> For months now, States and their subdivisions have responded to the pandemic by imposing unprecedented restrictions on personal liberty, including the free exercise of religion. This initial response was understandable. In times of crisis, public officials must respond quickly and decisively to evolving and uncertain situations. At the dawn of an emergency—and the opening days of the COVID-19 outbreak plainly qualify—public officials may not be able to craft precisely tailored rules. Time, information, and expertise may be in short supply, and those responsible for enforcement may lack the resources needed to administer rules that draw fine distinctions. Thus, at the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules. In general, that is what has happened thus far during the COVID-19 pandemic.

> But a public health emergency does not give Governors and other public officials *carte blanche* to disregard the Constitution for as long as the medical problem persists. As more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights.

*Id.* at 2604 (2020). That was July, this is May almost a full year later, this Court cannot simply rely on decisions reached under different circumstances to sustain an indefinite suspension of Liberty and remain consistent with the Constitution or even *Jacobson* as we sit here today.

**B. Plaintiffs Do Have a Liberty Interest in Exercising Their Freedom of Speech and Right to Assemble as Protected by the First Amendment.**

Plaintiffs have identified a liberty interest warranting due process of law, Defendants disagree because otherwise their actions most certainly run afoul of the Due Process Clause's protections by depriving Plaintiff in the manner they did of their ability to peacefully assemble and exercise their First Amendment Rights. Plaintiff states a plausible claim for relief under the First Amendment's right to peaceably assemble. The survival of Plaintiff's claim under this constitutional protection also depends upon the least restrictive means prong. The Secretary affords secular, commercial businesses less restrictive means to further the government's interest in public health. The Secretary's determined physical distancing and other precautions allow businesses to safely operate in-store. Restaurants and bars have been allowed to reopen, but Plaintiffs have been unable to reopen their organizations to all of their sponsored events such as bingo. It makes no logical sense for churches, restaurants, sporting events and other recreational activities to be permitted and for the Plaintiffs' operations to still be limited. Non-essential retail businesses and essential businesses, including breweries, restaurants, Isotopes Stadium, and movie theaters, are not subject to such restrictions such as that of the Plaintiff.

**C. Because There is a Fundamental Liberty Interest Impacted This Court Should Rely on the More Recent Supreme Court Decision for Guidance in Evaluating the PHO's Under Strict Scrutiny.**

It should be telling for the Court to observe that Defendants' legal arguments cling so desperately to decisions of the Supreme Court from the beginning of the pandemic when the public health crisis was truly emergent and then proceed to ignore the significant shift in jurisprudence that emerged when the pandemic was no longer an emergency, but instead just a manageable crisis. It is clear that this Governor cannot or will not respect that the surrender of liberties in the face of an emergency is starkly different than forcing the surrender of liberty to manage an ongoing public health concern. This concern over timing should animate the Court just as it did New Mexico Supreme Court Justice David Thomson in his specially concurring opinion, stating:

> The majority's holding should not communicate that executive or legislative responses to the pandemic will always receive the same level of judicial deference as when the crisis first emerged. In addition, I believe we must be wary of the precedent we set beyond the scope of the COVID-19 crisis. The executive must be allowed to act with some flexibly in times of true emergency and the means to address it. However, this does not relieve the executive of its obligation to show, subject to scrutiny and verification, that the stated emergency and the means to address it are reasonable.

*Grisham v. Romero*, 2021-NMSC-009, ¶ 49, 483 P.3d 545, 563.

Thus, while Defendants make much of the *Jacobsen* deference from the *Legacy Church* and *South Bay* decisions; they purposefully make nothing of the Supreme Court's shift, starting with *Roman Catholic Diocese of Brooklyn v. Cuomo,* 141 S. Ct. 63 (2020)., *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) and now *Tandon v. Newsom*, 141 S. Ct. 1294, (2021). This should blaringly betray the untenable path that they are attempting to lead this Court down contrary to the direction the Supreme Court has illuminated is correct to follow on cases concerned with First Amendment restriction. Equally troubling is that Defendants so callously make light of the First Amendment protected conduct of Plaintiffs as "drinking clubs". This is consistent with Defendants' lack of concern for religious freedom. It seems that the only

First Amendment protected conduct that Defendants showed concern for were political protests that matched their own political agenda.

It is entirely clear that our government should not be choosing which or how we practice our faiths, nor with whom or how we assemble to engage in our expressive conduct without facing strict scrutiny over those limitations of our First Amendment Freedoms. Without question, the more recent decisions of the Supreme Court make this clear, beginning with Justice Alito's dissent that "[w]e have a duty to defend the Constitution, and even a public health emergency does not absolve us of that responsibility." *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2604, 207 L. Ed. 2d 1129 (2020). Further, Justice Alito pointed out:

> Thus, at the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules. In general, that is what has happened thus far during the COVID–19 pandemic.
>
> But a public health emergency does not give Governors and other public officials *carte blanche* to disregard the Constitution for as long as the medical problem persists. As more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights. Governor Sisolak issued the directive in question on May 28, more than two months after declaring a state of emergency on March 12. Now four months have passed since the original declaration. The problem is no longer one of exigency, but one of considered yet discriminatory treatment of places of worship.

*Id.* at 2605.

Likewise, Justice Gorsuch was abundantly clear in his concurring opinion that "[g]overnment is not free to disregard the First Amendment in times of crisis. At a minimum, that Amendment prohibits government officials from treating religious exercises worse than comparable secular activities, unless they are pursuing a compelling interest and using the least restrictive means available. See *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Yet recently, during the COVID pandemic, certain States

seem to have ignored these long-settled principles." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 69, 208 L. Ed. 2d 206 (2020). Justice Gorsuch provided further guidance, concluding that "The parties before us have already shown their entitlement to relief. Saying so now will establish clear legal rules and enable both sides to put their energy to productive use, rather than devoting it to endless emergency litigation. Saying so now will dispel, as well, misconceptions about the role of the Constitution in times of crisis, which have already been permitted to persist for too long. It is time—past time—to make plain that, while the pandemic poses many grave challenges, there is no world in which the Constitution tolerates color-coded executive edicts that reopen liquor stores and bike shops but shutter churches, synagogues, and mosques. *Id.* at 72.

The majority of the High Court has since adopted this jurisprudence with Chief Justice Roberts stating "the Constitution also entrusts the protection of the people's rights to the Judiciary—not despite judges being shielded by life tenure, see *post,* at 720 (KAGAN, J., dissenting), but because they are. Deference, though broad, has its limits." *S. Bay United Pentecostal Church v. Newsom,* 141 S. Ct. 716, 717 (2021). Likewise, Justice Gorsuch, joined by Justices Thomas and Alito, stated succinctly in that decision:

> In cases implicating this form of "strict scrutiny," courts nearly always face an individual's claim of constitutional right pitted against the government's claim of special expertise in a matter of high importance involving public health or safety. It has never been enough for the State to insist on deference or demand that individual rights give way to collective interests. Of course we are not scientists, but neither may we abandon the field when government officials with experts in tow seek to infringe a constitutionally protected liberty. The whole point of strict scrutiny is to test the government's assertions, and our precedents make plain that it has always been a demanding and rarely satisfied standard. See *Lukumi*, 508 U.S. at 546, 113 S.Ct. 2217. Even in times of crisis—perhaps *especially* in times of crisis—we have a duty to hold governments to the Constitution.

*Id.* at 718.

9

Most recently, the Supreme Court (per curiam) held that in applying strict scrutiny with narrow tailoring:

> requires the government to show that measures less restrictive *1297 of the First Amendment activity could not address its interest in reducing the spread of COVID. Where the government permits other activities to proceed with precautions, it must show that the [First Amendment conduct] at issue is more dangerous than those activities even when the same precautions are applied. Otherwise, precautions that suffice for other activities suffice for [First Amendment conduct] too. *Roman Catholic Diocese*, 592 U. S., at ——– ——, 141 S.Ct., at 69-70; *South Bay*, 592 U. S., at ——, 141 S.Ct., at 719 (statement of GORSUCH, J.)

*Tandon v. Newsom*, 141 S. Ct. 1294, 1296–97 (2021).

This avoidance of clear recent First Amendment precedent is likely an attempt to mischaracterize the protected First Amendment conduct of these charitable non-profit organizations as "drinking clubs" without any evidence and contrary to the plain allegations of the complaint. To be clear, the state has prohibited these organizations, such as the Elks for example, from both conducting the playing of bingo and engaging in alcohol sales, while allowing actual drinking clubs without a charitable purpose, such as country clubs, to sell alcohol to patrons playing gin rummy on the premises in the same county. As a dodge, the government attempts, without evidence, to shoehorn the non-profits that use bingo and alcohol sales to engage in their charitable purposes into drinking clubs with no expressive conduct associated to their charitable purpose for assembling.

This is directly akin to the treatment of religious activities different from other similar secular activities in *Tandon*, wherein the majority stated:

> These principles dictated the outcome in this case, as they did in *Gateway City Church* v. *Newsom*, 592 U. S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2021 WL 308606 (2021). First, California treats some comparable secular activities more favorably than at-home religious exercise, permitting hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants to bring together more than three households at a time. App. to Emergency Application for Writ of Injunction 183–189. Second, the Ninth Circuit did not conclude that those activities pose a lesser risk of transmission

than *applicants'* proposed religious exercise at home. The Ninth Circuit erroneously rejected these comparators simply because this Court's previous decisions involved public buildings as opposed to private buildings. *Tandon v. Newsom*, 992 F. 3d 916, 919–20, 922–24, (C.A.9 2021). Third, instead of requiring the State to explain why it could not safely permit at-home worshipers to gather in larger numbers while using precautions used in secular activities, the Ninth Circuit erroneously declared that such measures might not "translate readily" to the home. *Id.*, at 926–27. The State cannot "assume the worst when people go to worship but assume the best when people go to work." *Roberts v. Neace*, 958 F.3d 409, 414 (C.A.6 2020) (*per curiam*).

*Id.* at 1297.

The example of the treatment of country clubs with gin rummy players versus the Elks with bingo players should highlight for this Court that Defendants' conduct cannot withstand rational basis review outside of the short duration of the beginning of the pandemic. More importantly this Court should not decide that the Plaintiffs' conduct is not subject to the protections for First Amendment assembly as properly alleged in the Complaint without providing Plaintiffs the opportunity to present such evidence at a preliminary injunction hearing.

It is shocking that a full year after the pandemic emerged as a crisis that these Defendants still cling so desperately to the emergency control to strip away the fundamental liberties of New Mexico's citizens. Perhaps that is because the tyranny associated to government control is so clearly threatened by the freedom to assemble and engage in expressive conduct that would yield a challenge to the abuse of power on full display here. The antidote to the heavy boot of a government that rests on the throat of Liberty long after the emergency has passed has always started in the Freedoms protected in the First Amendment.

**D. Defendants' Actions Lack Any Rational Basis and Have Lacked that Basis for Months**

As a general matter, the rational basis test requires only that the governmental action "bear[] a rational relationship to some legitimate end." *Romer v. Evans,* 517 U.S. 620, 631 (1996). Conversely, actions which are irrational, arbitrary or capricious do not bear a rational relationship

to any end. *Cty. Concrete Corp. v. Town of Roxbury,* 442 F.3d 159, 169 (3d. Cir. 2006) (quoting *Pace Resources, Inc., v. Shrewsbury Twp.,* 808 F.2d 1023, 1035 (3d Cir. 1987)) ("Thus, for appellants' facial substantive due process challenge to the Ordinance to be successful, they must 'allege facts that would support a finding of arbitrary or irrational legislative action by the Township.'")  Here, not only is the liberty interest of exercising free speech and freedom to assemble threatened, but the government has acted in a manner in which their speculation requires that they ignore available data to support a basis for shutting down the Plaintiffs' Organizations.

Unfortunately, such a disaster is now being disparately applied against the Plaintiffs and other New Mexico citizens in an undeniably arbitrary and capricious manner without any reasonable justification after the government was well aware of the potential for resurgence but choose to do nothing to prepare, and despite a year of data that removes the level of threat posed by Plaintiffs' organizations from the need for any speculation by the government.. Defendants make the specious comment that Plaintiffs are willing to risk the lives of their members but that the state is not, however, in so doing they ignore that the members are themselves individuals with the right to make their own choices for their lives to attend or not to attend Plaintiffs' organizational activities.  <u>On a basic level this type of nanny state control of the members' decisions is in and of itself irrational because it requires a belief that adults cannot make these decisions for themselves or their own children to attend a recreational facility in light of health risks.</u>  The concept of limitation on the degree to which the Defendants can continue to impose life altering restrictions on liberty was powerfully addressed by Judge Stickman of the Western District of the Pennsylvania Federal District Court stating:

> The Court closes this Opinion as it began, by recognizing that Defendants' actions at issue here were undertaken with the good intention of addressing a public health emergency. But even in an emergency, the authority of government is not unfettered. The liberties protected by the Constitution are not fair-weather

freedoms-in place when times are good but able to be cast aside in times of trouble. There is no question that this Country has faced, and will face emergencies of every sort. But the solution to a national crisis can never be permitted to supersede the commitment to individual liberty that stands as the foundation of the American experiment. The Constitution cannot accept the concept of a "new normal" where the basic liberties of the people can be subordinated to open-ended emergency mitigation measures. Rather, the Constitution sets certain lines that may not be crossed, even in an emergency. Actions taken by Defendants crossed those lines. It is the duty of the Court to declare those actions unconstitutional.

*County of Butler v. Wolf*, 2020 WL 5510690, at *31 (W.D. Pa. Sept. 14, 2020).

It simply cannot be cogent with the history and traditions of our Constitutional Republic that such boundaryless power can be wielded against the association of the citizens or to wield it against citizens that wish to make a decision to attended organizational sponsored charitable activities for such arbitrary and capricious reasons such as the difference between drinking and playing gin rummy versus drinking and playing bingo.  Thus, it cannot even be legitimately argued by Defendants that they are engaged in the rational speculation that would satisfy a rational basis test.

When this Court views the statement from Nora Meyers Sackett, a spokeswoman for Governor Lujan Grisham, that "the state's epidemiologists have made it very clear that these record numbers are due to the fact we are dealing with unprecedented public health risk statewide that <u>can't be pinned on one specific place or another</u>,"[1] (emphasis added) against the common sense comparison of country clubs and fraternal organizations like Plaintiffs that are distinguishable contributors to spread and that there is zero evidence that supports that Plaintiffs organization following established guidelines for similar organizations and businesses are any more likely to spread the virus; this Court cannot reasonably find that Defendants can satisfy the rational basis

---

[1] NM Daily virus total blows past record – ABQ Journal https://www.abqjournal.com/1507033/daily-virus-total-blows-past-record.html

test.

**E. Plaintiffs Procedural Due Process Claim is Unprecedented and Does Not Fit the Existing Rubric**

Again, juxtaposed against the beginning of the pandemic in an emergent situation and the need for quick legislative action by the executive branch unburdened by the expense of procedural hearings to guide the state in unknown territory, a requirement for procedural due process makes sense. But that juxtaposition is no longer validly considered, or at least if the government was doing its job should no longer be an issue. In fact, the only procedural due process option that Plaintiffs have, after over a year and billions of tax dollars spent addressing the pandemic, to address the propriety of the government's actions to deprive them of their liberty interest, that the state wishes desperately to ignore, is this lawsuit. Nowhere outside of the unfortunate decision in *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944)[2] can Plaintiffs locate any jurisprudence that is analogous to the present situation. Thus, the citizen is left with virtually no procedural recourse to address the destruction of their livelihoods through a series of new executive fiat legislative announcements. At least, when the Legislature in New Mexico convenes to enact new measures drastically impacting the lives of New Mexicans, New Mexican have some, albeit now diminished, ability to participate

---

[2] Finally, the dissent invokes *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). Whatever rhetorical advantage the dissent may see in doing so, *Korematsu* has nothing to do with this case. The forcible relocation of U.S. citizens to concentration camps, solely and explicitly on the basis of race, is objectively unlawful and outside the scope of Presidential authority. But it is wholly inapt to liken that morally repugnant order to a facially neutral policy denying certain foreign nationals the privilege of admission. See *post,* at 2447 – 2448. The entry suspension is an act that is well within executive authority and could have been taken by any other President—the only question is evaluating the actions of this particular President in promulgating an otherwise valid Proclamation.

The dissent's reference to *Korematsu,* however, affords this Court the opportunity to make express what is already obvious: *Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—"has no place in law under the Constitution." 323 U.S., at 248, 65 S.Ct. 193 (Jackson, J., dissenting).

*Trump v. Hawaii*, 138 S. Ct. 2392, 2423, 201 L. Ed. 2d 775 (2018)

in the hearings of the legislative process.  Here the offending orders of the Defendants are done in the dark room of a closed meeting between the Governor and her cabinet members with no meaningful notice or meaningful opportunity for input from those affected. The New Mexico Court of Appeals defines due process as "notice and 'an opportunity to be heard at a meaningful time and in a meaningful manner.'" *State ex rel. Children, Youth & Families Dept. v. Maria C.*, 2004-NMCA-083, ¶ 26, 136 N.M. 53, 62 (*citing Mafin M.*, 2003–NMSC–015, ¶ 18, 133 N.M. 827, 70 P.3d 1266 (internal quotation marks and citation omitted). In that same case, the Court of Appeals citing the U.S. Supreme Court noted that "[r]oot principles of fairness dictate that procedural due process be afforded whenever a <u>government decision threatens to deprive an individual of a fundamental liberty or property interest</u>. *Mathews,* 424 U.S. at 332–33, 96 S.Ct. 893." *State ex rel. Children, Youth & Families Dept. v. Maria C.*, 2004-NMCA-083, ¶ 24 (emphasis added). Here, even though they have had 12 months to craft some procedural process to address the impacted liberty interest of Plaintiffs, there is <u>none</u>.

## II.     DEFENDANTS ACTIONS DO VIOLATE EQUAL PROTECTION

Defendants' conflation of a fundamental liberty interest with a recognized protected liberty interest such as the right to engage in one's chosen profession as established above again dooms their argument here.  Likewise, the idea that their speculation which requires that they wholly ignore their own accumulated scientific data about the spread of COVID in similar businesses cannot form the basis for a rational basis.  The Equal Protection Clause of the Fourteenth Amendment forbids the states to "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. 14th Amend. Where a plaintiff in an equal protection claim does not allege that distinctions were made on the basis of a suspect classification such as race, nationality, gender or religion, the claim arises under the "class of one" theory. *Village of Willowbrook v. Olech*, 528

U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). To prevail on such a claim, the plaintiff must demonstrate: 1) the defendant treated him differently than others similarly situated, 2) the defendant did so intentionally, and 3) there was no rational basis for the difference in treatment. *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d. Cir. 2006). As explained above, the rational basis test is forgiving, but not without limits in its deference including irrational speculation that requires ignoring data and forming illogical conclusions regarding the playing of gin rummy versus bingo. Distinctions cannot be arbitrary or irrational and pass scrutiny. "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) This unequal treatment, which has only become more pronounced as some businesses offering admittedly similar service were allowed to open while others were not, is not defensible as "rationally related" to the state's interest in combatting COVID-19. *City of New Orleans v. Dukes,* 427 U.S. 297, 303 (1976). But such irrational speculation should not "*reasonably* be conceived to be true by the [Governor]" for several reasons. *Vance v. Bradley,* 440 U.S. 93, 111 (1979).

In short, the Defendants' actions fail rational basis because in the name of stopping the spread of COVID-19 and preventing hospitals from being overwhelmed, it prohibits expressive associational gatherings to sell alcohol to contribute to a charitable purpose but does not prohibit the selling of alcohol by an organization that does not have a charitable purpose. Although the state undoubtedly has broad police powers with which to address public health concerns, it cannot enact a discriminatory regulation that lacks any rational connection to the stated goal—as it has done here, with devastating effect, even more so when achieving the state goal is no longer tied to a reasonable belief that the health care system will be overwhelmed if drastic measures prohibiting

expressive associational assembly are not undertaken.

## **CONCLUSION**

For all the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Respectfully submitted this 28th day of May 2021.

> WESTERN AGRICULTURE, RESOURCE
> AND BUSINESS ADVOCATES, LLP
>
> */s/ A. Blair Dunn*
> A. Blair Dunn, Esq.
> Jared R. Vander Dussen, Esq.
> 400 Gold Ave SW, Suite 1000
> Albuquerque, NM 87102
> (505) 750-3060
> abdunn@ablairdunn-esq.com
> warba.llp.jared@gmail.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2021, I filed the foregoing via the CM/ECF filing system

causing all parties of record to be served via electronic means.

*/s/ A. Blair Dunn*

A. Blair Dunn, Esq.